[Nos. A121316, A122041. First Dist., Div. One. June 25, 2009.]

ANASTASIYA KOMAROVA, Plaintiff and Respondent, v.
NATIONAL CREDIT ACCEPTANCE, INC., Defendant and Appellant.

## COUNSEL

Ellis, Coleman, Poirier, LaVoie & Steinheimer, Mark E. Ellis and Andrew M. Steinheimer for Defendant and Appellant.

Cotchett, Pitre & McCarthy, Anne Marie Murphy, Justin T. Berger and Niall P. McCarthy for Plaintiff and Respondent.

Melanie Hirsch and Leslie Bailey for Public Justice as Amicus Curiae on behalf of Plaintiff and Respondent.

Stuart T. Rossman for National Consumer Law Center as Amicus Curiae on behalf of Plaintiff and Respondent.

Robert P. Capistrano for Bay Area Legal Aid as Amicus Curiae on behalf of Plaintiff and Respondent.

Erica K. Pun for Legal Aid Society of San Mateo County as Amicus Curiae on behalf of Plaintiff and Respondent.

Dennis J. Herrera, City Attorney (San Francisco), Danny Chou, Chief of Complex & Special Litigation, and Christine Van Aken, Deputy City Attorney, for City and County of San Francisco as Amicus Curiae.

Rockard J. Delgadillo, City Attorney (Los Angeles) and Don Kass, Assistant City Attorney, for City of Los Angeles as Amicus Curiae.

## OPINION

**MARCHIANO, P. J.**—This lawsuit arises from the efforts of defendant National Credit Acceptance, Inc., to collect a consumer debt from plaintiff Anastasiya Komarova that she did not owe. We review alleged debt collection abuse in the context of a mistaken identity case. Defendant appeals (A121316) from the judgment for plaintiff on jury verdicts finding defendant liable for violations of the Rosenthal Fair Debt Collection Practices Act (Civ. Code, § 1788 et seq.; hereafter, the Rosenthal Act, or the Act) and for intentional infliction of emotional distress. Defendant also appeals (A122041) from the order awarding plaintiff attorney fees on her cause of action under the Rosenthal Act.

These consolidated appeals raise issues under the Act of apparent first impression in California state courts: (1) whether conduct violating the Act is shielded by the litigation privilege (Civ. Code, § 47, subd. (b))—our answer to that question is "no"; (2) whether the continuing violation doctrine permits recovery for violations of the Act that occurred beyond the statute of limitations—our answer, under the circumstances in this case, is "yes"; and (3) whether a multiplier can be used in calculating attorney fees awarded under the Act—our answer is "yes."

Apart from defendant's arguments on these issues, the appeals have merit on the following issues. We conclude that the litigation privilege precludes liability on plaintiff's cause of action for intentional infliction of emotional distress, and that the court relied on an improper factor in granting an attorney fee multiplier. We therefore modify the judgment for plaintiff, and reverse the attorney fee order.

## I. APPEAL NO. A121316

### A. *Background*

#### (1) *Facts*

MBNA America Bank, N.A. (MBNA), issued a Visa card to Christopher Propper in 2001; Propper requested an additional card for "Anastasia

Komarova," identified as his fiancée on the credit application, and she became an authorized user on the account. The account became delinquent, and was charged off by MBNA in November 2004, with an unpaid balance of $7,872.98. The account was purchased from MBNA by defendant in December 2004.

Plaintiff, whose first name, unlike that of the woman listed on Propper's credit application, includes the letter "y," was born in Russia and immigrated to the United States in 1995. In February 2005, plaintiff was working as an esthetician at An Essential Day Spa in Sunnyvale, California. The spa was owned by plaintiff's father-in-law, Monem Nayebi; he and plaintiff's husband, Nima Nayebi, worked there as hairstylists.

In January 2005, defendant obtained a credit report for plaintiff, which misspelled her name without the letter "y," listed addresses for her in the San Francisco Bay Area, and did not identify any MBNA account. Defendant's personnel tracked down the number of the spa and called there in February 2005, asking to speak to plaintiff or her "husband" Propper. Katherine Hinds, a receptionist at the spa who answered the call, informed the caller that plaintiff was not available and that Propper was not plaintiff's husband. The caller left a phone number and said that the call concerned a $7,000 debt.

Plaintiff returned the call later that day and spoke to a man who told her that she and Propper had defaulted on a credit card. She told the man that she knew no one by that name, and that the debt was not hers. She suggested that the mistake might have been associated with a theft of her wallet a few months earlier. She did not know "where this caller was calling from," and was alarmed when he identified her Social Security number, her current home address in San Francisco, and addresses where she had previously lived. She worried that she was speaking with "a criminal who knows my address and everything about me." The man gave her a fax number and suggested that she file a police report. She said that she reported the conversation to the police in Sunnyvale and San Francisco, and was informed that there were no grounds for lodging a police report. The police thought that the inquiry she received about the Propper debt "could be criminal activity," and told her that she should not give the caller any information.

The credit card agreement provided for arbitration before the National Arbitration Forum (NAF), and defendant filed a claim on the debt with the NAF in March 2005 against Propper and "Anastasia Komarova," who were both listed at an address in Long Beach, California. In June 2005, an NAF arbitrator issued defendant an award of $11,214.33, which included amounts for accrued interest and attorney fees, and found that the claim had been served in accordance with NAF rules.

Collection calls to the spa continued. Hinds described the calls as "quite persistent and rude." The callers spoke with plaintiff and left her messages, but never revealed that they were calling on behalf of defendant. Plaintiff testified that when she asked the callers to identify themselves they would say, "You know who we are. We have sent you plenty of mail, things like that. Sometimes they would hang up." Plaintiff was not informed until April that the debt she allegedly owed was on an account with MBNA, at which point she called MBNA and was advised that MBNA had no record of an account with her name or Social Security number.

Plaintiff received a call in early July 2005 from a man who identified himself as "Anthony" and said that "a judge [had] decided I was guilty." Plaintiff received a call on July 21, 2005, from a different man who identified himself as "Mark Anthony" and said, "We know you can pay. We know about your savings account." Mark Anthony said that she now owed over $11,000, which coincided with the amount she and Nima had in their savings account. She handed the phone to Nima, who demanded that they be sent a bill for the alleged debt. Mark Anthony agreed to send a "verification of debt" form and, for the first time, provided defendant's name and address. Plaintiff received in her mail at home a form that listed the MBNA account number, the dates the account was opened and closed, a balance due of $7,872.98, and a phone number for defendant's account manager, "P. Brown."

Plaintiff took the form to the San Francisco Police Department and told an officer of her concern that defendant "might be fraudulent." According to the police report, the officer called defendant, asked to speak to "P. Brown," and was told by a woman who refused to identify herself, "I don't know who you [are] talking about." The officer asked to speak to a manager, and was transferred to a man who identified himself as "Mr. Anthony." The officer asked whether defendant had a business license number, and Mr. Anthony said that a supervisor would call back shortly. The officer did not hear further from defendant, and wrote in the report that he was "unsure if the company National Credit Acceptance Inc. or Mr. Anthony are legitimate." Plaintiff said the officer advised her not to contact or send any information to defendant.

Nima testified that he and plaintiff learned, at some point between the July 21 phone call and September 2005, when plaintiff left her job at the spa, that there had been an arbitration and that plaintiff was now legally responsible for the alleged debt; he recalled that they went onto the Internet to find out what an "arbitration" was.

Nima and Monem testified that collection calls to the spa continued into late December 2005. After the spa was closed in early November 2005,

callers heard a recorded message that provided a new number, which was Monem's cell phone number until late November or early December, and Nima's cell phone number thereafter. Nima and Monem both received calls from defendant on their cell phones. Monem said that he never spoke with any of the collectors; he saved their messages for plaintiff, but stopped listening to them after May 2005. Nima said that he did not answer any of the calls he received from defendant on his cell phone, and that the callers to that phone left no messages. Nima said that the calls stopped in January 2006.

Monem testified that collection calls were placed to the spa "maybe every other day," or at the rate of "maybe three times a week." Plaintiff estimated that she received around 48 messages or voice mails from defendant. The calls continued even though plaintiff repeatedly asked the callers to stop contacting her and to check with MBNA to clear up the matter.

Plaintiff was served with a petition to confirm the NAF arbitration award on February 1, 2006. The petition was set for a hearing in the Long Beach Judicial District of the Los Angeles County Superior Court on February 15, 2006. Plaintiff testified that she had never heard of the NAF before receiving the petition to confirm the award, and had received no notice of the NAF arbitration.

On the day after receiving the petition, plaintiff faxed defendant's counsel a copy of the August 2005 San Francisco Police Department report and a letter stating in part: "I have been getting unnerving, rude and disruptive phone calls at work from National Credit Acceptance Inc. for the past 18 to 24 months now regarding this supposed debt. I have kept records of these calls. My husband and I have attempted to explain, to no avail, that they have the wrong person. The people I have spoken with are extremely unethical, and have simply yelled at me every-time they called, refusing to hear what I have to say. This is harassment, and we have repeatedly asked them to stop. My family and I have been put under stress. I'm not sure if this is a case of identity theft or mistaken identity on your part, but it is definitely a violation of my privacy and rights. It has also been disruptive to my life as well as my husband's life, and has caused us extreme pain, suffering, anguish, expense, and time among other things. . . . [¶] [W]e have . . . called MBNA, the original creditor, and they have three times confirmed that I do not now, nor have EVER had an account with them. . . . [M]y legal and true name is not even spelled correctly in your documents. MBNA has also confirmed to me that they have an Anastasia Komarova in Glendale, CA. MBNA also stated that they don't have any Anastasia Komarova in San Francisco. [¶] . . . [¶]

[P]lease call MBNA and confirm the information I have given you. The slightest research will assure you that you do indeed have the wrong person!"

Plaintiff was able, with considerable effort, to find an attorney in Long Beach to represent her on the petition to confirm the arbitration award. Defendant took the February 15 hearing on the petition off calendar, and took no further action to collect the debt from plaintiff. April 5, 2006 entries in defendant's collection log for the credit card account stated: "Fraud investigation complete. Conclusion: Incorrect person identified as debtor two. Incorrect person served. No evidence of fraud." Despite these notes, defendant's president, Michael Sahlbach, testified that in his opinion defendant never received any information conclusively confirming that plaintiff was *not* the Komarova on the account. He said that defendant stopped pursuing plaintiff because it concluded that it could not prove that plaintiff was in fact the debtor, and "[t]he presumption in our company is if you can't prove it, they're not the one."

Sahlbach was asked why notice of the arbitration was served in Southern California after defendant had contacted plaintiff at a phone number in Northern California: "A. It is not unusual for us to be unaware of a person's home address but potentially have a place of employment where they may work. Given the nature of the business that we're in, frequently we have missing bits and pieces of information concerning our customers. Q. So you think that it was possible that Ms. Komarova commuted 5- or 600 miles to work? A. Absolutely, yes. Q. Absolutely yes? A. Yes. She may well have been working there part-time, or she may not have been working there at all. It might have been a false lead." Sahlbach said that defendant's practice was to enclose with a verification of debt form a copy of any arbitration award that had been obtained, but admitted that he had no proof that defendant had done so in plaintiff's case.

Sahlbach said that defendant's records showed that Propper "and the resident identified as Komarova" had both been personally served with notice of the arbitration at the Long Beach address listed in the arbitration claim. "Q. So, wouldn't that imply then that as of the time of the service of the Notice of Arbitration, the Komarova associated with the Propper account was in Southern California, not Northern California? A. It would seem to suggest that. Q. And yet NCA was calling Plaintiff Ms. Komarova in Northern California? A. Correct. Q. Doesn't that raise any red flags in your mind? A. No. That's not an unusual circumstance in our world. We frequently have people that reside in Los Angeles and have jobs in the Bay Area, or people that even travel across states for conduct of business and their homes are

elsewhere. [¶] It's also not unusual for people that previously resided together to then reside apart, and they may still receive mail, and that may be their legal residence at the previous[] location, but they have since gone and, you know, have taken jobs elsewhere. So we don't ever know what the true situation is."

### (2) *Procedural History*

The complaint was filed on October 12, 2006; causes of action other than those for violations of the Rosenthal Act and for intentional infliction of emotional distress were summarily adjudicated in defendant's favor. The second amended complaint alleged violations of six provisions of the Act: Civil Code sections 1788.11, subdivisions (b), (d), and (e), 1788.12, subdivision (a), and 1788.15, subdivisions (a) and (b).[1]

Before the case was submitted to the jury, the court granted a nonsuit as to the alleged violation of section 1788.15, subdivision (b) (judicial proceedings outside specified counties), and the jury found for defendant on the alleged violation of section 1788.11, subdivision (d) (repeated annoying telephone ringing). The jury returned special verdicts finding that defendant had violated section 1788.11, subdivision (b) (calling without disclosure of identity) and subdivision (e) (unreasonably frequent, harassing communications); section 1788.12, subdivision (a) (communications with employer); and section 1788.15, subdivision (a) (judicial proceedings without service of process). The jury awarded $197,905 in damages for the violations of the Act: $2,905 for economic loss, and $195,000 for noneconomic loss. In a separate special

---

[1] Unless otherwise indicated, all further statutory references are to the Civil Code. The statutes plaintiff sought to enforce read in pertinent part: "No debt collector shall collect or attempt to collect a consumer debt by means of the following practices: [¶] . . . [¶] (b) Placing telephone calls without disclosure of the caller's identity . . . . [¶] . . . [¶] (d) Causing a telephone to ring repeatedly or continuously to annoy the person called; or [¶] (e) Communicating, by telephone or in person, with the debtor with such frequency as to be unreasonable and to constitute an harassment to the debtor under the circumstances." (§ 1788.11.)

"No debt collector shall collect or attempt to collect a consumer debt by means of the following practices: (a) Communicating with the debtor's employer regarding the debtor's consumer debt unless such a communication is necessary to the collection of the debt . . . . A communication is necessary to the collection of the debt only if it is made for the purposes of verifying the debtor's employment, [or] locating the debtor . . . ." (§ 1788.12.)

"(a) No debt collector shall collect or attempt to collect a consumer debt by means of judicial proceedings when the debt collector knows that service of process, where essential to jurisdiction over the debtor or his property, has not been legally effected. [¶] (b) No debt collector shall collect or attempt to collect a consumer debt, other than one reduced to judgment, by means of judicial proceedings in a county other than the county in which the debtor has incurred the consumer debt or the county in which the debtor resides at the time such proceedings are instituted, or resided at the time the debt was incurred." (§ 1788.15, subds. (a), (b).)

verdict, the jury found defendant liable for intentional infliction of emotional distress, and awarded $67,905 on that cause of action: $2,905 for economic loss, and $65,000 for noneconomic loss. In another special verdict, the jury made findings that supported an award of punitive damages on the cause of action for intentional infliction of emotional distress. In a second phase of the trial, the jury awarded plaintiff punitive damages of $75,000.

## B. *Discussion*

### (1) *Privilege Defense*

#### (a) *The Litigation Privilege*

■ Communications in judicial proceedings are privileged under section 47, subdivision (b)(2). "[T]he privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some connection or logical relation to the action." (*Silberg v. Anderson* (1990) 50 Cal.3d 205, 212 [266 Cal.Rptr. 638, 786 P.2d 365] (*Silberg*).) Judicial or quasi-judicial proceedings protected by the privilege include private contractual arbitrations. (*Moore v. Conliffe* (1994) 7 Cal.4th 634, 648–649 [29 Cal.Rptr.2d 152, 871 P.2d 204].) The privilege covers communications made "to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." (*Silberg, supra*, 50 Cal.3d at p. 212.) "[C]ommunications with 'some relation' to an *anticipated* lawsuit are . . . within the privilege." (*Rubin v. Green* (1993) 4 Cal.4th 1187, 1194 [17 Cal.Rptr.2d 828, 847 P.2d 1044] (*Rubin*); see, e.g., *Edwards v. Centex Real Estate Corp.* (1997) 53 Cal.App.4th 15, 35, fn. 10 [61 Cal.Rptr.2d 518] [threat to file suit is privileged provided litigation is seriously contemplated].)

■ "The purposes of section 47, subdivision (b), are to afford litigants and witnesses free access to the courts without fear of being harassed subsequently by derivative tort actions, to encourage open channels of communication and zealous advocacy, to promote complete and truthful testimony, to give finality to judgments, and to avoid unending litigation. [Citation.] To effectuate these purposes, the litigation privilege is absolute and applies regardless of malice. [Citation.] Moreover, '[i]n furtherance of the public policy purposes it is designed to serve, the privilege prescribed by section 47[, subdivision (b)] has been given broad application.' [Citation.]" (*Rusheen v. Cohen* (2006) 37 Cal.4th 1048, 1053, 1063 [39 Cal.Rptr.3d 516, 128 P.3d 713] (*Rusheen*).) The privilege bars tort claims other than for malicious prosecution (*Silberg, supra*, 50 Cal.3d at p. 212), and has been

interpreted to preclude constitutional and statutory causes of action (*Jacob B. v. County of Shasta* (2007) 40 Cal.4th 948, 952 [56 Cal.Rptr.3d 477, 154 P.3d 1003] [suit based on violation of constitutional right]; *Rubin, supra,* 4 Cal.4th at p. 1204 [suit based on violation of statute]; *Ribas v. Clark* (1985) 38 Cal.3d 355, 364–365 [212 Cal.Rptr. 143, 696 P.2d 637] (*Ribas*) [statutory violation].) On the other hand, the privilege has been held not to prevent criminal and State Bar prosecutions under statutes that are "more specific than the litigation privilege and would be significantly or wholly inoperable if [their] enforcement were barred when in conflict with the privilege." (*Action Apartment Assn., Inc. v. City of Santa Monica* (2007) 41 Cal.4th 1232, 1246 [63 Cal.Rptr.3d 398, 163 P.3d 89] (*Action Apartment*); see also *Begier v. Strom* (1996) 46 Cal.App.4th 877, 885 [54 Cal.Rptr.2d 158] [privilege did not apply where statute provided damages for knowingly false reports of child abuse; to hold otherwise "would essentially nullify the Legislature's determination that liability should attach"].)

> (b) *Whether the Privilege Applies to the Cause of Action Under the Rosenthal Act*

 Defendant contends that the litigation privilege bars plaintiff's claims under the Act. The issue has not yet been discussed in any reported California state court case, but has been addressed by a number of federal district courts. Some of those decisions have found the privilege to be applicable. (*Cassady v. Union Adjustment Co., Inc.* (N.D.Cal., Oct. 27, 2008, No. C 07-5405 SI) 2008 WL 4773976, pp. *6–*7; *Lopez Reyes v. Kenosian & Miele, L.L.P.* (N.D.Cal. 2007) 525 F.Supp.2d 1158, 1160–1165 (*Lopez Reyes*); *Nickoloff v. Wolpoff & Abramson, L.L.P.* (C.D.Cal. 2007) 511 F.Supp.2d 1043, 1045–1046; *Taylor v. Quall* (C.D.Cal. 2006) 458 F.Supp.2d 1065, 1067–1069.) However, most have concluded that the privilege must yield in this context. (*Welker v. Law Office of Horwitz* (S.D.Cal., June 16, 2009, Nos. 08CV2259-IEG (WMc), 08CV2262-IEG (WMc)) 626 F.Supp.2d 1068, 1072 [2009 WL 1687771, p. *3]; *Gerber v. Citigroup, Inc.* (E.D.Cal., Jan. 29, 2009, No. CIV S-07-0785 WBS JFM PS) 2009 WL 248094, pp. *4–*5 (*Gerber*); *Sial v. Unifund CCR Partners et al.* (S.D.Cal., Aug. 28, 2008, No. 08 CV 0905 JM (CAB) 2008 WL 4079281, p. *5 (*Sial*); *Johnson v. JP Morgan Chase Bank* (E.D.Cal. 2008) 536 F.Supp.2d 1207, 1211–1212 (*Johnson*); *Yates v. Allied Intern. Credit Corp.* (S.D.Cal. 2008) 578 F.Supp.2d 1251, 1255–1256; *Butler v. Resurgence Financial, L.L.C.* (C.D.Cal. 2007) 521 F.Supp.2d 1093, 1095–1097 (*Butler*); *Mello v. Great Seneca Financial Corp.* (C.D.Cal. 2007) 526 F.Supp.2d 1024, 1030–1031; *Oei v. N. Star Capital Acquisitions, L.L.C.* (C.D.Cal. 2006) 486 F.Supp.2d 1089, 1098–1101 (*Oei*).) We agree with the majority of these cases that the privilege cannot be used to shield violations of the Act.

The *Oei* case is particularly instructive. The plaintiffs there, like plaintiff here, were pursued for payment of a credit card debt they did not owe. The creditor, North Star, filed a collection action in superior court, and thereafter called the plaintiffs numerous times demanding payment of the debt. North Star obtained a default judgment, and garnished one of the plaintiff's wages. After the plaintiffs obtained counsel, North Star agreed to set aside the default judgment and return the garnished wages, and dismissed the action. The *Oei* court rejected North Star's claim that its conduct was privileged:

"Were the privilege to apply broadly to Rosenthal Act claims . . . it would effectively immunize conduct that the Act prohibits. The Act, for example, proscribes . . . repeated, continuous and harassing telephone calls [citations]. This is precisely the type of conduct in which the Oeis allege defendants engaged.

"The complaint alleges that, after commencing a state-court collection action, defendants called the Oeis incessantly on the telephone, verbally harassing them and falsely accusing them of owing North Star an outstanding debt. The complaint further alleges that the communications were intended to goad the Oeis into paying the debt they purportedly owed North Star. Payment, of course, was also the remedy North Star sought in the pending collection action. If the litigation privilege were applicable to Rosenthal Act claims, these communications would fall within its scope as they were made by a litigant in connection with a judicial proceeding to achieve the object of the litigation. [Citations (to numerous cases involving settlement demands, including threats to file suit, and threats such as " 'we'll destroy you' " in settlement discussions).]

"Applying the privilege in this manner would effectively vitiate the Rosenthal Act and render the protections it affords meaningless. As there appears to be no way to reconcile the statutes, the court applies the familiar principle of statutory construction that, in cases of irreconcilable conflict, the specific statute prevails over the general one." (*Oei, supra*, 486 F.Supp.2d at p. 1100.)

Here, as in *Oei*, application of the privilege would negate plaintiff's Rosenthal Act claims. The privilege would protect defendant's prosecution of judicial proceedings—the arbitration and subsequent petition to confirm the arbitration award—to collect the alleged debt, when it knew that service of process in the arbitration had not been effected, in violation of section 1788.15, subdivision (a). (*Action Apartment, supra*, 41 Cal.4th at p. 1249 ["no communication . . . is more clearly protected by the litigation privilege

than the filing of a legal action"]; *Rubin, supra*, 4 Cal.4th at p. 1195 [filing of complaint and subsequent pleadings were privileged acts]; see *Rusheen, supra*, 37 Cal.4th at p. 1058 [false declaration of service of process was privileged]; see also *Lopez Reyes, supra*, 525 F.Supp.2d at p. 1164 [acknowledging conflict between the privilege and § 1788.15]; and cf. *Sial, supra*, 2008 WL 4079281 at p. *5 [defendant argued that the privilege applied to § 1788.17 claim, but conceded that it did not apply to § 1788.15 claim].) The privilege will inevitably conflict with claims under section 1788.15, subdivision (a).

The privilege also conflicts, in the circumstances of this case, with plaintiff's claims under sections 1788.11, subdivisions (b) and (e) (calling without disclosing identity; frequent calling amounting to harassment) and 1788.12 (communications with employer) based on defendant's improper phone calls. Plaintiff argues that these communications were not privileged because they constituted "traditional debt collection activity," and "occurred well outside the context of any judicial proceeding." However, as the *Oei* opinion explained with respect to the harassing phone calls in that case, the calls here were made in connection with a judicial proceeding to achieve the object of the litigation, i.e., payment of the alleged debt. As such, they were privileged under the precedents involving settlement demands. Here, unlike *Oei*, some of the calls were placed before the litigation was instituted, but those calls were also privileged as demands made in contemplation of litigation. "A prelitigation communication is privileged . . . when it relates to litigation that is contemplated in good faith and under serious consideration." (*Action Apartment, supra*, 41 Cal.4th at p. 1251.) According to defendant's collection activity log, the first call to plaintiff was placed on February 25, 2005, and the arbitration was instituted shortly thereafter on March 4, 2005. Defendant was thus clearly contemplating litigation when it began calling plaintiff. Consequently, "the litigation privilege and the Rosenthal Act cannot be reconciled in the context of this case." (*Oei, supra*, 486 F.Supp.2d at p. 1101.)

█ Exceptions to the litigation privilege have been recognized under statutes that (1) are "more specific" than the privilege, and (2) would be "significantly or wholly inoperable" if the privilege applied. (*Action Apartment, supra*, 41 Cal.4th at p. 1246.) Defendant argues that the litigation privilege is more specific than the Rosenthal Act because the privilege "only applies to communications related to litigation," while the Act "prohibits a broad range of practices in the context of debt collection," "whether in litigation or not." However, the privilege is implicated in all judicial and quasi-judicial proceedings and the Act is implicated in only the small subset of those proceedings that involve collection of consumer debts. We note that

the Legislature specifically prohibited certain litigation related activity when it passed the Rosenthal Act in 1977, presumably aware of the extant broad litigation privilege in section 47. We therefore agree with *Oei* and the federal cases in accord with *Oei* that the Act is the more specific statute.

Whether the Act would be "significantly inoperable" if its prohibited activity were not excepted from the privilege is a closer question. Defendant submits that an exception from the privilege is unnecessary to effectuate the Act because "[t]he majority of debt collection attempts have nothing to do with litigation." Defendant reasons that because "[o]nly a small percentage of debts are ever litigated," the Act "will still provide broad protection to consumers from improper attempts to collect debts even if all litigation related communications are excluded from [its] reach . . . ." Nothing in the record supports defendant's assertions about the percentage of debts litigated, but we will assume for purposes of this opinion that a great many of them are not.

■ We must nonetheless be mindful of the ease with which the Act could be circumvented if the litigation privilege applied. In that event, unfair debt collection practices could be immunized merely by filing suit on the debt. The defendants in *Gerber, supra*, 2009 WL 248094 at page *1, for example, allegedly " 'kept a state court collection lawsuit secret from plaintiff and his attorney for nearly a year while supposedly communicating in good faith as to an alleged debt.' . . . Plaintiff claims defendants did this 'so they could commit aggressive and egregious violations of fair debt collection laws while retaining a hidden 'hole card' for privilege . . . .' " Moreover, the Act's prohibitions of deliberate neglect of service of process (§ 1788.15, subd. (a)) and distant forum abuse (§ 1788.15, subd. (b)) would be nullified by the privilege. The Legislature presumably would not have included those protections in the Act if it intended for the privilege to apply.[2] Further, as noted in *Butler, supra*, 521 F.Supp.2d at page 1096, the Act is "a remedial statute [that] should be interpreted broadly in order to effectuate its purpose." (See *People ex rel. Lungren v. Superior Court* (1996) 14 Cal.4th 294, 313 [58 Cal.Rptr.2d 855, 926 P.2d 1042] ["civil statutes for the protection of the public are, generally, broadly construed in favor of that protective purpose"].) For these reasons, we conclude that the Act would be significantly inoperable if it did not prevail over the privilege where, as here, the two conflict.

Defendant was not entitled to judgment on the Rosenthal Act claims on the ground of privilege.

---

[2] Defendant argues that an intent to have the privilege applied can be inferred from the Act's exemption of attorneys (§ 1788.2, subd. (c)), but we fail to see the connection. There would arguably be little need for the exemption if the privilege were applicable. Attorneys are in any event subject to discipline for violating the Act. (Bus. & Prof. Code, § 6077.5, subds. (a) & (i).)

### (c) Whether the Privilege Applies to the Cause of Action for Intentional Infliction of Emotional Distress

█ It is well settled that the litigation privilege bars causes of action for intentional infliction of emotional distress. (*Action Apartment, supra,* 41 Cal.4th at p. 1242; *Rusheen, supra,* 37 Cal.4th at p. 1063; *Rubin, supra,* 4 Cal.4th at p. 1194, fn. 3; *Silberg, supra,* 50 Cal.3d at p. 215; *Ribas, supra,* 38 Cal.3d at p. 364.) *Oei* and other federal cases that have found the privilege inapplicable to Rosenthal Act claims have nevertheless held that it precluded claims for intentional infliction of emotional distress. (*Oei, supra,* 486 F.Supp.2d at pp. 1101–1103; *Gerber, supra,* 2009 WL 248094 at p. *6; *Johnson, supra,* 536 F.Supp.2d at p. 1214.) Clear authority (*Action Apartment, supra,* at p. 1242; *Rusheen, supra,* at p. 1063; *Rubin, supra,* at p. 1194, fn. 3; *Silberg, supra,* at p. 215; *Ribas, supra,* at p. 364) dictates that the same conclusion be drawn here.[3]

█ Plaintiff contends that the litigation privilege is inapplicable because she was never made a party to the arbitration proceeding. This argument is untenable under *Action Apartment, supra,* 41 Cal.4th at pages 1247–1248, which "decline[d] to recognize a broad exception to the litigation privilege for any party who did not participate in the underlying litigation. An exception to the litigation privilege for all suits brought by parties who were not involved in the underlying litigation would be antithetical to the privilege's purposes. The litigation privilege 'has been referred to as "the backbone to an effective and smoothly operating judicial system." ' [Citation.] It 'promotes the effectiveness of judicial proceedings by encouraging "open channels of communication and the presentation of evidence" in judicial proceedings.' [Citation.] We have observed that an ' "external threat of liability is destructive of [the] fundamental right [of access to judicial and quasi-judicial proceedings] and inconsistent with the effective administration of justice." ' [Citation.] The litigation privilege is meant to protect more than the parties to a lawsuit from derivative suits that they might later bring against each other. Derivative litigation brought by parties who did not participate in the underlying litigation, like litigation brought by parties who

---

[3] In view of this conclusion, which requires reversal of the judgment insofar as it includes damages for intentional infliction of emotional distress and punitive damages, we need not reach defendant's arguments that the evidence was insufficient to support those parts of the judgment, or that the damages awarded for intentional infliction of emotional distress were duplicative of those awarded for violations of the Act. It is not disputed that punitive damages are unavailable under the Act, or that "actual damages" recoverable under the Act (§ 1788.30) include those for the plaintiff's emotional distress. Precluding causes of action for intentional infliction of emotional distress in Rosenthal Act cases thus serves only to eliminate recovery of punitive damages.

did participate, would pose an external threat of liability that would deter potential litigants, witnesses, and others from participating in judicial proceedings."

Consistent with this passage in *Action Apartment*, the litigation privilege has shielded litigants from liability to nonparties who claim to have been damaged by communications in the action. In *Brown v. Kennard* (2001) 94 Cal.App.4th 40, 46–51 [113 Cal.Rptr.2d 891], an action arising from a levy on the plaintiff's assets based on an allegedly invalid judgment, the privilege was held to bar a cause of action for abuse of process even though the plaintiff was not a defendant in the underlying action. In *Sacramento Brewing Co. v. Desmond, Miller & Desmond* (1999) 75 Cal.App.4th 1082, 1089–1091 [89 Cal.Rptr.2d 760], where the plaintiff was falsely identified as the debtor in a bankruptcy pleading, the court held that the plaintiff's defamation claim was barred by the privilege and rejected the plaintiff's contention that the privilege did not apply because it was a stranger to the bankruptcy case.

Plaintiff's argument for a contrary result rests on *Rouse v. Law Offices of Rory Clark* (S.D.Cal. 2006) 465 F.Supp.2d 1031 (*Rouse*), a suit that grew out of the defendants' attempts to recover on a debt owed by the plaintiff's father. The defendants obtained a default judgment and recorded an abstract of judgment against the plaintiff's property even though he had told them that he was not the debtor. He sued the defendants for violation of the Rosenthal Act and intentional infliction of emotional distress, and the defendants moved to strike these causes of action under the anti-SLAPP (strategic lawsuit against public participation) statute (Code Civ. Proc., § 425.16). The court denied the motions, finding that the defendants had failed to make the threshold showing that the causes of action arose from activity protected by the anti-SLAPP law. (See generally *Rusheen, supra,* 37 Cal.4th at p. 1055.) In so deciding, the court noted among other things that the plaintiff was not a party to the debt collection litigation, and distinguished *Rusheen* on the ground that *Rusheen* involved a levy on the property of a judgment debtor, not a stranger to the action (*Rouse, supra,* at p. 1039, fn. 6).

■ The *Rouse* decision cannot bear the weight plaintiff seeks to give it. *Rouse* discussed the litigation privilege, but it is distinguishable because the issue it decided was the reach of the anti-SLAPP statute, not that of the privilege, and the two are not co-extensive. "[S]ection 47 does not operate as a limitation on the scope of the anti-SLAPP statute" (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325 [46 Cal.Rptr.3d 606, 139 P.3d 2]) and "statements protected by the litigation privilege are not necessarily protected by the anti-SLAPP statute" (*Century 21 Chamberlain & Associates v. Haberman* (2009) 173 Cal.App.4th 1, 10 [92 Cal.Rptr.3d 249]; see also *Kibler v. Northern*

*Inyo County Local Hospital Dist.* (2006) 39 Cal.4th 192, 201–202 [46 Cal.Rptr.3d 41, 138 P.3d 193] [official proceedings privilege and anti-SLAPP statute do not cover " 'the same or analogous subject matter' " because the former is "a substantive rule of law" and the latter "is a procedural device to screen out meritless claims"]). A rule that the litigation privilege cannot be invoked against a stranger to the action cannot be squared with *Action Apartment*, much less derived from the fact that *Rusheen* dealt with a levy on a judgment debtor's property.

■ Plaintiff contends that the purposes of the litigation privilege would not be served by applying it here, but as to the cause of action for intentional infliction of emotional distress, this case is the very sort of derivative suit the privilege is meant to preclude. The privilege "seeks to encourage free access to the courts and finality of judgments by limiting derivative tort claims arising out of litigation-related misconduct and by favoring sanctions within the original lawsuit." (*Rusheen, supra,* 37 Cal.4th at p. 1063.) Plaintiff claims that she "could not assert her rights in the arbitration or Superior Court proceedings for the simple fact that she was not a party thereto." However, she was served with the petition to confirm the arbitration award and could have appeared and sought sanctions in the confirmation proceeding. The privilege bars the cause of action for intentional infliction of emotional distress in this as in other cases.

### (2) *Statute of Limitation Defense*

■ Actions under the Rosenthal Act "may be brought . . . within one year from the date of the occurrence of the violation." (§ 1788.30, subd. (f).) Defendant argues that it is entitled to judgment on plaintiff's claims under the Act because all of the violations occurred prior to October 12, 2005—one year before the complaint was filed.

The court found that defendant's statute of limitations defense was overcome by the continuing violation doctrine, which permits recovery "for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period[.]" (*Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798, 812 [111 Cal.Rptr.2d 87, 29 P.3d 175].) "The key is whether the conduct complained of constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts. If there is a pattern, then the suit is timely if 'the action is filed within one year of the most recent [violation]' [citation], and the entire course of conduct is at issue." (*Joseph v. J.J. Mac Intyre Companies, L.L.C.* (N.D.Cal. 2003) 281 F.Supp.2d 1156, 1161 (*Joseph*).)

■ The *Joseph* case held that the continuing violation doctrine developed in employment cases dealing with matters such as hostile work environments, where the claims by " '[t]heir very nature involve[] repeated conduct' " rather than " 'discrete acts' " (*Joseph, supra*, 281 F.Supp.2d at p. 1160), applied to Rosenthal Act violations such as "repeated harassing phone calls" (*ibid.*). Debt collection activities like "a phone call at midnight, or a threatening call to a consumer's employer, are discrete acts." (*Id.* at p. 1161.) However, as in the case of a hostile work environment, "claims of a pattern of debtor harassment consisting of a series of calls 'cannot be said to occur on any particular day.' [Citation.] Under the appropriate circumstances therefore, the continuing violation doctrine may apply to debt collection claims." (*Ibid.*, italics & fn. omitted.) Application of the doctrine to the facts alleged in *Joseph*, which included harassing phone calls (§ 1788.11, subd. (e)) that continued into the limitations period, was "not only logical by way of analogy [to hostile work environment cases], it [was] entirely consistent with the . . . Rosenthal Act's broad remedial purpose of protecting consumers." (*Joseph, supra*, at p. 1162.)

Defendant argues that *Joseph* is distinguishable because the course of conduct in that case violated only a single section of the Act, but the plaintiff in *Joseph*, like plaintiff here, alleged that the defendant had violated sections 1788.11, subdivision (b) (calling without disclosing identity) and 1788.11, subdivision (d) (telephone ringing to annoy), as well as section 1788.11, subdivision (e). (*Joseph, supra*, 281 F.Supp.2d at pp. 1162, 1164.) The test under *Joseph* for use of the continuing violation doctrine is whether the violations constitute "a continuing pattern and course of conduct," or "unrelated discrete acts." (*Joseph, supra*, at p. 1161.) Unreasonably frequent calling (§ 1788.11, subd. (e)) is clearly a continuing course of conduct under this test because the violation occurs only through repetition. Calling without disclosure of identity (§ 1788.11, subd. (b)) and improper communication with an employer (§ 1788.12, subd. (a)) could be single, discrete acts; however, as we read *Joseph*, the continuing violation doctrine can be applied to such acts if they are part of a pattern of unreasonably frequent calling that extends into the limitations period; in that event, they are not "unrelated" discrete acts. Use of judicial proceedings to collect a debt without service of process (§ 1788.15, subd. (a)) will also be a continuing course of conduct insofar as the conduct involves multiple acts, such as obtaining and collecting on a judgment, that extend over a period of time before the proceedings are concluded.

Defendant contends that the continuing violation doctrine cannot be applied here because no unlawful conduct occurred within the limitations period. Defendant reasons that the section 1788.11, subdivisions (b) and (e)

violations (calling without disclosing identity; frequent calling amounting to harassment) ceased by October 2005 because all of the collection calls were placed to the spa and plaintiff stopped working there in September 2005; the section 1788.12, subdivision (a) violations (communications with employer) ceased by October 2005 because no one at the spa was plaintiff's employer after September 2005; and the section 1788.15, subdivision (a) violation (deliberate neglect of service of process) ended before October 2005 because the arbitration in which the defective service occurred was completed in June 2005. Defendant concedes that the distant forum abuse claim under section 1788.15, subdivision (b) would have been timely because it was predicated on proceedings to confirm the arbitration award that continued into 2006, but defendant maintains that the " 'tether' of the only timely alleged 'violation' " that would have permitted use of the continuing violation doctrine was "cut" when the court dismissed that claim.

██ Defendant takes too narrow a view of its violation of section 1788.15, subdivision (a), which prohibits an "attempt to collect a consumer debt by means of judicial proceedings" when service of process has been knowingly neglected. Those attempts were not abandoned as to the arbitration award obtained without proper service here until after plaintiff was served with the petition to confirm it, an event that occurred within the limitations period in February 2006. ██ As for the harassing phone calls, plaintiff's witnesses testified that the calls to the spa continued into December 2005, within a year before the suit was filed. Defendant submits that the calls after plaintiff stopped working at the spa in September 2005 were not actionable under section 1788.11, subdivision (e) because they did not get through to plaintiff and the statute requires communications "with the debtor." However, we do not interpret the statute to require that a plaintiff answer harassing collection calls before they can be actionable. As previously explained, because the harassing phone calls were a continuing course of conduct that extended into the limitations period, plaintiff could recover under the continuing violation doctrine for all of the violations that occurred during those calls. Defendant is mistaken in claiming that the evidence did not support the doctrine's application in this case.

Defendant contends that whether collection calls were made within the limitations period was a disputed issue of fact that had to be resolved by the jury. Defendant argues that the court erroneously declined its request to instruct the jury on the statute of limitations, and erroneously "refused to revisit its ruling on the statute of limitations" after it dismissed the claim for distant forum abuse. Defendant's proposed statute of limitations instruction was as follows: "An action to enforce any liability created [by] the Act must be filed within one year from the date on which the violation occurs. [¶] In this action, you may not hold any defendant liable for any act or omission that occurred before October 12, 2005." The court correctly denied this

instruction, which erroneously presumed that the continuing violation doctrine was inapplicable. Nor did the court "refuse to revisit" the statute of limitations issue after dismissing the distant forum abuse count—defendant did not *ask* for reconsideration of the issue before the case was submitted to the jury. If, as defendant now claims, the jury should have been called upon to decide whether collection calls were placed after October 12, 2005, it should have requested an instruction or special finding on the point below. Because no such request was made, that factual issue is, on appeal, solely one of substantial evidence, and we must credit Nima's and Monem's testimony that the calls persisted to the end of 2005.

## II. APPEAL NO. A122041

### A. *Record*

Plaintiff moved for attorney fees under the Act, which provides that in "any action to enforce any liability under this title . . . [r]easonable attorney's fees, which shall be based on time necessarily expended to enforce the liability, shall be awarded to a prevailing debtor . . . ." (§ 1788.30, subd. (c).) The motion sought an award of $378,375, representing $252,250 in fees incurred, increased by a multiplier of 1.5. A partner in the law firm representing plaintiff declared in support of the multiplier request "that the firm bore substantial risk in taking the case [on a contingency basis.] [¶] . . . [¶] [U]nlike an hourly case, there was no assurance that fees and costs would ultimately be recovered. The attorneys and paralegals that worked on [the case] diverted their attention from other matters, including hourly matters, in order to work on [the case], despite the fact that fees and costs were not assured."

Defendant contested the motion, and submitted that reasonable fees under the Act would be "at most $60,000.00." Defendant argued that a multiplier was unavailable under the Act in view of the Act's stipulation that fees are to be "based on time necessarily expended," and that no justification for a multiplier had been shown in any event.

The court reduced the lodestar amount by 35 percent, to $163,962, to preclude an award for work on the cause of action for intentional infliction of emotion distress and other matters in the case for which no fees were recoverable.[4] The court applied a multiplier of 1.25 to this sum, resulting in an award of $204,953. Additional fees were awarded, with no multiplier, on

---

[4] Since the court did not award fees in connection with the intentional infliction of emotional distress cause of action, reversal of the judgment on that count does not require reexamination of the lodestar.

plaintiff's supplemental motion for posttrial work, and an amended judgment was entered for fees totaling $230,740.50.

At the hearing on the first fee motion, the court said it thought "the most persuasive argument for a multiplier, and I think that would probably come under *Serano vs. Priest* [presumably referring to *Serrano v. Priest* (1977) 20 Cal.3d 25 [141 Cal.Rptr. 315, 569 P.2d 1303]; hereafter *Serrano III*], that as I understand it, there is no public agency that polices the debt collection industry. [¶] . . . [¶] [I]n the State of California there is no longer a bureau of collections which has license or control. So it would seem that the primary vehicle for policing unfair practices lies with the bar in bringing contingent cases, as far as I can tell." The court later asked defense counsel, "Doesn't [*Serrano III*] raise the point that multipliers are appropriate where there is a necessity for private lawsuits, to act as a watch dog if you will or to encourage private lawsuits where there is not otherwise supervision or a vehicle for regulation to ensure the safety of the public?"

The court ruled with respect to the multiplier as follows: "[T]he court has . . . considered with great care the issue of a multiplier. And I mentioned already a prime factor in that consideration . . . is that it is only by this type of lawsuit that . . . the Rosenthal Act in practical terms would be enforced. I just don't see any other mechanism for it, and I think that there is authority in California for considering that. [¶] [I]t is not only the fact that this is a contingency case that the court is inclined to award a multiplier, although that is a factor. . . . [¶] This required a substantial element of risk and . . . looking at this broadly, from a standpoint of regulation of the debt collection industry which the [Rosenthal] Act seeks to do, it appears to this court that a multiplier is justified in the best interests of society . . . ."

The order granting the fee motion reads in relevant part: "The Court finds that a multiplier is appropriate in this case for a number of reasons. First, the result was excellent and Plaintiff's counsel was highly skilled in their presentation of the case. In addition, the law firm of Cotchett, Pitre & McCarthy bore a substantial element of risk in bringing the case. The Court also notes that cases such as the instant case fulfill a public purpose. This is especially true given the fact that the debt collection industry is no longer regulated by the State of California."

B. *Discussion*

(1) *Whether a Multiplier Is Permitted*

Defendant reiterates its argument below that a multiplier cannot be used in awarding attorney fees under the Act because the Act limits recoverable fees to those that are "based on time necessarily expended" in the action.

 The multiplier is the adjustment under the lodestar adjustment method of calculating fee awards. Under this method, the court "begins with a touchstone or lodestar figure, based on the 'careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case.' " (*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1131–1132 [104 Cal.Rptr.2d 377, 17 P.3d 735] (*Ketchum*).) The lodestar "should ordinarily include compensation for *all* the hours *reasonably spent*" on the case (*id.* at p. 1133, original italics), but the court must "carefully review attorney documentation of hours expended; 'padding' in the form of inefficient or duplicative efforts is not subject to compensation." (*Id.* at p. 1132.) The lodestar may then be adjusted "to fix a fee at the fair market value for the particular action." (*Ibid.*) The adjustment can be based on "factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." (*Ibid.*)

The lodestar adjustment method originated in *Serrano III*, which was decided in 1977, shortly after the Legislature passed the Rosenthal Act with the attorney fee provision at issue. (Stats. 1977, ch. 907, § 1, pp. 2771, 2777.) "Before 1977, numerous California courts had held that if a contract or a statute permitted an award of attorney fees or reasonable attorney fees, the determination of the amount was a matter committed to the sound discretion of the trial court. [Citations.] The trial court was expected to consider many factors in deciding what constituted a reasonable fee . . . . [Citations.] But no mechanical formula dictated how the court should evaluate all these factors. Instead, it had wide latitude in assessing the value of the attorney's services, and its decision was not to be disturbed on appeal absent a manifest abuse of discretion. [Citations.] [¶] But in 1977, our Supreme Court decided *Serrano III* . . . . [T]he *Serrano III* court circumscribed that discretion to some extent by approving the touchstone or lodestar adjustment method of calculating the amount of an award." (*Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 638–639 [71 Cal.Rptr.2d 632] (*Flannery*).) The method was seen as " 'the only way of approaching the [fee calculation] problem that can claim objectivity . . . .' " (*Serrano III, supra*, 20 Cal.3d at p. 48, fn. 23.)

 Given the longstanding and widespread use of the lodestar adjustment method since *Serrano III* (see *Ketchum, supra*, 24 Cal.4th at pp. 1131–1136), the *Ketchum* court held that when a statute "refer[s] to attorney fees and costs without indicating any restrictions on how they are to be calculated [it is] presume[d] that the Legislature intended courts use [that] method" (*id.* at p. 1136). "When the Legislature has determined that the lodestar adjustment approach is not appropriate, it has expressly so stated. Thus, in 1993, it amended Code of Civil Procedure section 1021.5 to provide

that attorney fees awarded to a public entity under the section 'shall not be increased or decreased by a multiplier based upon extrinsic circumstances, as discussed in [*Serrano III, supra,*] 20 Cal.3d 25, 49.' (Stats. 1993, ch. 645, § 2, p. 3747.) Its express restriction on the use of fee enhancements therein 'can be read as an implicit endorsement of their use in other contexts.' [Citations.]" (*Ketchum, supra,* 24 Cal.4th at p. 1135.)

In support of its argument that section 1788.30, subdivision (c) is a statute that expressly precludes the use of lodestar adjustment method, defendant points to statutes providing for fees that are actually or reasonably "incurred." Code of Civil Procedure section 1036, for example, directs that a plaintiff awarded compensation in an inverse condemnation action be awarded reasonable attorney fees "actually incurred because of that proceeding . . . ." *Andre v. City of West Sacramento* (2001) 92 Cal.App.4th 532, 537 [111 Cal.Rptr.2d 891], held that under this statute "the court must first determine what fees were actually incurred. It must then assess whether the fees are reasonable. In other words, the fees actually incurred are a ceiling to any fee award . . . ." Section 1794, subdivision (d) states that a buyer prevailing in an action under that section is to be awarded "attorney's fees based on actual time expended, determined by the court to have been reasonably incurred by the buyer in connection with the commencement and prosecution of such action." *Nightingale v. Hyundai Motor America* (1994) 31 Cal.App.4th 99, 104–105 [37 Cal.Rptr.2d 149], limited a plaintiff's award under this statute to the fees for which she had been billed. These statutes and cases are inapposite because the issue thereunder, whether fees have been reasonably or actually incurred, is a different question from whether time has been necessarily expended as the statute requires. (See *id.* at pp. 102–105 [addressing first whether "the claimed time was actually expended," and then whether the fees awarded had been "incurred"].)

Defendant argues and we agree that the words "time necessarily expended" in section 1788.30, subdivision (c) must limit awardable attorney fees in some way; if they did not, they would be superfluous. However, the language refers to the lodestar, and not to the multiplier as defendant contends. The court determines whether time has been "necessarily expended" on a case in the first stage of the lodestar adjustment method, when it reviews the billing records and eliminates " 'padding' " in the form of "inefficient or duplicative" services in setting the lodestar. (*Ketchum, supra,* 24 Cal.4th at p. 1132.) The court then proceeds to the separate question of whether adjustment of the lodestar is warranted. We therefore reject defendant's argument that the language in question bears on and limits the use of a multiplier in setting fee awards under the Rosenthal Act. Now that the lodestar adjustment method is firmly established, a statute need not stipulate

that recoverable fees are to be "based on time necessarily expended." As previously noted, however, the Act was passed before *Serrano III* was decided.

### (2) *Whether the Multiplier was Properly Granted*

Defendant argues that the court erred by basing its decision to grant a multiplier here on the necessity of private enforcement of the Rosenthal Act. Defendant is correct for reasons explained in this court's decision in *Flannery*. There we reversed an attorney fee award in a FEHA case because the court applied erroneous standards, including the need for private enforcement of the statute, in deciding that a multiplier of the lodestar was justified. (*Flannery, supra*, 61 Cal.App.4th at pp. 633, 647.)

The necessity of private enforcement to vindicate public policies was cited in *Serrano III, supra*, 20 Cal.3d at page 44, among the reasons for awarding fees under the "private attorney general" doctrine. That doctrine is codified in Code of Civil Procedure section 1021.5, which states that fees may be awarded to the successful party in an action to enforce an important right affecting the public interest if, among other things, "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate . . . ." (Code Civ. Proc., § 1021.5, subd. (b).) As we observed in *Flannery, supra*, 61 Cal.App.4th at page 647, "[w]hether an award is justified and what amount that award should be are two distinct questions, and the factors relating to each must not be intertwined or merged." (*Ibid.*) The "criteria . . . govern[ing] a party's entitlement to an award under the private attorney general statute . . . do not provide any basis for calculating the amount of an award, let alone for enhancing or applying a multiplier to the lodestar." (*Ibid.*)

Plaintiff contends that even if the court erred in granting a multiplier because of the need for private enforcement of the Act, the multiplier can be sustained based on other valid factors—contingency risk, skill of presentation—that the court cited. However, it is clear from the transcript that the need for private enforcement was the court's principal reason for applying the multiplier, and the showing for a multiplier, including the contingent risk factor, was otherwise very thin. We must therefore reverse the attorney fee order so that the matter of the multiplier can be reconsidered. (See *Flannery, supra*, 61 Cal.App.4th at p. 647 [fee award reversed where lodestar adjustment discretion was not exercised in accordance with proper factors].) The court should also explain how any valid factors warrant a multiplier.

## III. DISPOSITIONS

The judgment is modified to eliminate the damages on the cause of action for intentional infliction of emotional distress and the punitive damage award. As so modified, the judgment is affirmed. The attorney fee order is reversed, with directions to reconsider the lodestar multiplier. Plaintiff is entitled to her reasonable attorney fees on appeal attributable to the defense of the judgment on her claims under the Rosenthal Act, in an amount to be determined by the trial court. The parties will otherwise bear their own costs in these appeals.

Margulies, J., and Graham, J.,* concurred.

A petition for a rehearing was denied July 16, 2009, and appellant's petition for review by the Supreme Court was denied October 14, 2009, S175231.

---

*Retired judge of the Marin Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.