Filed 1/15/14  Lefkowitz CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| GARY LEFKOWITZ, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RAY WIRTA et al., <br><br> Defendants and Respondents. | B232628 <br><br> (Los Angeles County <br> Super. Ct. No. BC435862) |

APPEAL from judgments of the Superior Court of Los Angeles County.  Ruth Ann Kwan, Judge.  Affirmed.

Gary Lefkowitz, in pro. per., for Plaintiff and Appellant.

Bingham McCutchen, Michael A. Sherman and Robert A. Brundage for Defendants and Respondents CB Richard Ellis Group, Inc., CB Richard Ellis Services, Inc., Koll Real Estate Services Company, Koll Management Services, K/B Opportunity Investors, K/B Fund II, J. Robert Gilroy, First West Capital Corporation, Freeman Spogli & Co., FS Equity Partners III, FS Equity Partners International LP, KBS Realty Advisors, LLC, The Bren Company, Charles J. Schreiber, Blum Strategic Partners, L.P., Richard C. Blum and Associates, Inc., Richard C. Blum, Koll General Partner Services, Koll Capital, Donald M. Koll, The Koll Company, Koll Holding Company, Ray Wirta, Harold Hofer, Koll Real Estate Group, Inc., K/B Fund, K/B Realty Advisors, Inc., and K/B Opportunity Fund.

Hodel Briggs Winter, Karla J. Kraft and Fred L. Wilks for Defendants and Respondents General Electric Capital Corporation, General Electric Capital Services, Inc., and ZJL Housing, Inc.

Sheppard, Mullin, Richter & Hampton, Robert J. Stumpf, Jr. and Martin D. White for Defendants and Respondents Triad Development, Inc., KEG Equity Group, LLC, and Frederick W. Grimm.

_____

Gary Lefkowitz (appellant) appeals from final judgments entered against him after the trial court sustained without leave to amend three demurrers, filed by different defendants, to appellant's first amended complaint (FAC), on the ground that appellant's claims were barred under the relevant statutes of limitations.

## CONTENTIONS

Appellant contends that the trial court erred in sustaining the demurrers on statute of limitations grounds. Specifically, appellant contends that: (1) no cause of action was complete until he stopped receiving K-1 forms from the Internal Revenue Service (IRS) on April 15, 2006; (2) the FAC pleads facts invoking the delayed discovery rule; (3) the FAC pleads equitable tolling; (4) the FAC pleads estoppel by conduct; (5) the FAC pleads equitable tolling due to a fiduciary relationship; (6) silence in the face of a duty to speak results in the tolling of the statute of limitations; (7) the continuing violation rule is applicable; and (8) his claims are timely based on the last overt act rule under a conspiracy theory.

## FACTUAL BACKGROUND

### General allegations[1]

Appellant's FAC alleges that appellant was the founder of Citi Equity Group, Inc., and CEG, Inc. (CEG). From 1984 to 1994, appellant and CEG formed approximately 250 limited partnerships in which appellant and Citi Equity Group or CEG were the general partners. The partnerships held legal or beneficial ownership of thousands of

_____

[1]     The facts in this section are allegations taken from appellant's FAC.

2

apartment units comprising hundreds of individual apartment buildings in over 20 states. In 1994, appellant was indicted and Citi Equity Group was placed into an involuntary bankruptcy proceeding.[2]

Appellant alleges that in the fall of 1994 he signed a "Confidentiality and Non Circumvention Agreement" (CNCA) with an affiliate of the Koll Company (Koll), which bound Koll and its affiliates, subsidiaries, assigns, successors, parents, shareholders and others. Through the CNCA, the parties expressed a nonbinding intention to enter into a relationship in order to develop a program to acquire the interests of the limited partners in the partnerships and to sell such interests and/or the low income housing projects owned by the partnerships to new purchasers. The document also confirmed Koll's agreement that all of the information relating to the business structure of the limited partnerships and the methods of purchasing and reselling the limited partnerships constitutes a trade secret of appellant; that Koll and its affiliates would not disclose such trade secrets nor use any such secrets except as contemplated in the agreement; and that Koll and its affiliates would indemnify and hold appellant harmless from any loss, damage, cost or expense incurred by appellant as a result of any breach of the agreement. Appellant alleges he shared confidential information about the partnerships with Koll in reliance on the agreement.

Appellant further alleges that Koll and its affiliates misused confidential information he provided under the CNCA to take control of the limited partnerships and related assets, obtain income from them, and divest appellant of his partnership interest and income. In July 1995, appellant spoke with Michael J. Leseney (Leseney), a member of Koll Equity Group, LLC (KEG), who represented that Koll and KEG had entered into an agreement to purchase CEG, and CEG had agreed to purchase all of the partnership interests in all of the partnerships in which they were general partners. Leseney asked

---

[2]    Appellant was later convicted on multiple counts of "mail and wire fraud, managing a continuing financial crimes enterprise, defrauding an agency of the United States, aiding in the preparation of false tax returns, making a false statement in connection with a bankruptcy case, and obstruction of justice." (*United States v. Lefkowitz* (8th Cir. 1997) 125 F.3d 608, 612.) He is currently serving a prison term.

appellant to not contest the removal of appellant as the sole general partner in each of the limited partnerships. Leseney allegedly assured appellant that upon his removal, appellant would be entitled to the same economic interest and participation in the partnerships as if he remained general partner. Appellant relied on these representations.

Despite Leseney's request, appellant thereafter did contest his removal as general partner and filed litigation in federal court in Minnesota and in the Eighth Circuit Court of Appeals. On October 27, 1995, following appellant's conviction, KEG gained control of the limited partnerships by purchasing general partner interests from appellant's bankrupt companies. A condition of the transactions was appellant's removal as general partner of the partnerships. On November 13, 1995, appellant received a letter informing him that he was removed as a general partner of the partnerships.

**Specific allegations against the respondents**

Appellant set forth allegations against 43 defendants, 34 of whom are respondents in this appeal. The respondents categorize themselves in three groups: the CBRE respondents;[3] the GE respondents;[4] and the Triad respondents.[5]

### *Allegations against the CBRE respondents*

Appellant alleged eight causes of action against the CBRE respondents. The first cause of action, for breach of contract, alleges that the respondents breached the CNCA.

---

[3] The CBRE respondents are: CB Richard Ellis Group, Inc.; CB Richard Ellis Services, Inc.; Koll Real Estate Services Company; Koll Management Services; K/B Opportunity Investors; K/B Fund II; J. Robert Gilroy; First West Capital Corporation; Freeman Spogli & Co.; FS Equity Partners III; FS Equity Partners International LP; KBS Realty Advisors, LLC: The Bren Company; Charles J. Schreiber; Blum Strategic Partners, L.P.; Richard C. Blum and Associates, Inc.; Richard C. Blum; Koll General Partner Services; Koll Capital; Donald M. Koll; The Koll Company; Koll Holding Company; Ray Wirta; Harold Hofer; Koll Real Estate Group, Inc.; K/B Fund; K/B Realty Advisors, Inc.; and K/B Opportunity Fund.

[4] The GE respondents are: General Electric Capital Corporation; General Electric Capital Services, Inc.; and ZJL Housing, Inc.

[5] The Triad respondents are: Triad Development, Inc.; KEG Equity Group, LLC; and Frederick W. Grimm.

Appellant alleges the respondents used the confidential information to purchase the Citi Equity Group and CEG general partner interests; file bankruptcy reorganization plans removing appellant as general partner and taking the position that appellant no longer had any interest in the partnerships whatsoever; and to purchase accounts payable and receivables in the face amount of over $85,000,000, among other things.

In his second cause of action, appellant alleges fraud. Appellant alleges the respondents made false promises to hold strictly confidential the information contained in the CNCA and not to use it for any purpose other than in connection with business to be commenced with appellant. Appellant further alleged the respondents lulled him into thinking his interests were protected.

In his third cause of action, appellant alleges a violation of the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.). Specifically, appellant alleges the information obtained under the CNCA contained trade secrets, which the respondents misappropriated.

In his fourth cause of action, appellant alleges the respondents breached a confidential relationship with him and used the confidential information to deprive appellant of his interest in the limited partnerships and buy and sell accounts receivable owed by the limited partnerships.

In his seventh cause of action, appellant alleges interference with prospective business advantage. Specifically, he alleges that in reliance on the CNCA, he revealed to the respondents that there was an economic advantage to buying the accounts payable from the limited partnerships to CEG at a discount, and then reselling low-income tax credits to new buyers after making the limited partnerships whole. The respondents allegedly used this information to deprive appellant of economic participation in the acquisition and collection of the accounts receivable owed by the limited partnerships to CEG, and of participation in reselling the tax credits.

Appellant's eighth cause of action is for declaratory relief. Appellant seeks a declaration that he owns a one percent partner interest, and a 25 percent backend general partner interest due on the sale or refinancing of any property owned by the partnerships.

5

Appellant's ninth cause of action, alleged under the Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. § 1961 et seq.) (RICO), states that the respondents used wrongful means to misappropriate appellant's confidential information and used it to perform the acts already described.

In his 10th and final cause of action, appellant alleges fraudulent transfer. In this cause of action, appellant alleges that respondents helped KEG obtain promissory notes that had been due from the limited partnerships to CEG, and secured the notes against the assets of the limited partnerships. Appellant alleges that these transfers were made to prevent him from receiving any benefit under the notes.

### Allegations against the GE respondents

As part of the limited partnership reorganizations that took place in 1995 and 1996, KEG, as the new general partner, offered to sell to the GE defendants limited partnership interests and the right to benefit from the limited partnerships' remaining tax credits. Appellant alleges that through due diligence in connection with this transaction, the GE respondents knew or should have known that the purchase price paid by the GE respondents was to be used largely to pay debts owed to K/B Fund and/or K/B Fund II, that the debts did not properly belong to those entities or to KEG, and that the GE respondents had a duty to insist that KEG use the money to pay other necessary partnership expenses.

The GE respondents participated in the drafting and approval of a bankruptcy reorganization plan for each of the partnerships in which the GE respondents would invest. The GE respondents submitted declarations to the bankruptcy court allegedly stating that, through an investment entity called "NP," the GE respondents would acquire 98 percent limited partner interests in the partnerships, and that they would contribute sufficient cash to pay 50 percent or more of the debts owed to K/B Funds and/or K/B Fund II. The declarations also disclosed that the GE respondents' investment was conditioned upon the removal of appellant as general partner of the partnerships. Appellant alleges that each plan of reorganization and disclosure statement for each limited partnership stated that interests previously held by appellant would be held by

6

KEG.  Appellant alleges that at the time that he reviewed the reorganization plans, he placed a phone call to Leseney of KEG and was assured that his interests in the partnerships were preserved by KEG, and that there was no need for him to object to the reorganization plans.

Based on these allegations, appellant asserts four causes of action against the GE respondents:  (1) the sixth cause of action for tortious interference with contract; (2) the eighth cause of action for declaratory relief; (3) the ninth cause of action for claims arising under the RICO Act; and the 10th cause of action for fraudulent transfer.

Under the sixth cause of action for tortious interference with contract, appellant alleges that the GE respondents tortiously interfered with his rights under the limited partnership agreements and his rights under the CNCA.  With respect to the fraudulent transfer claim, appellant alleges that the GE respondents aided and abetted, or conspired with, other respondents to allow respondent KEG to purchase the $85 million in promissory notes due from the limited partnerships to Citi Equity Group, Inc. and CEG, and to assign the notes to K/B Fund and K/B Fund II.  As set forth above, appellant's declaratory relief claim seeks a determination that appellant retained an economic interest in the partnerships.

### Allegations against the Triad respondents

The Triad respondents are named in appellant's first cause of action for breach of contract; third cause of action for violation of the Uniform Trade Secrets Act; fourth cause of action for breach of confidential relationship; fifth cause of action for breach of fiduciary duty; seventh cause of action for tortious interference with prospective business advantage; eighth cause of action for declaratory relief; ninth cause of action for claims arising under the RICO Act; and 10th cause of action for fraudulent transfer.

In the fifth cause of action for breach of fiduciary duty, appellant alleges that by virtue of becoming a general partner in the limited partnerships of which appellant was a partner, KEG owed appellant a fiduciary duty.  Appellant alleges that this fiduciary duty was breached when KEG purchased notes payable from the partnerships and due to Citi Equity Group and CEG, and by preferring the interests of KEG over the interests of

7

appellant by selling and assigning those notes to K/B Fund and/or K/B Fund II to the exclusion of appellant. Appellant further alleges that KEG breached its fiduciary duty by "cherry picking" from the limited partnership the most profitable properties and partnerships and by ceasing to act in the best interest of the limited partnerships that did not contain the most profitable properties.

As to the other causes of action named against the Triad respondents, the allegations are similar to those described above involving the other respondents.

**Allegations regarding accrual of appellant's causes of action**

Appellant alleges that the bankruptcy disclosure statements and plans of reorganization for the limited partnerships were drafted in whole or in part by Leseney, J. Robert Gilroy (Gilroy) (a member of KEG Equity Group, LLC; the President of and a shareholder in First West Capital Corporation; and the President of Koll Capital), and KEG and its members. Appellant claims he relied upon the representations made in the disclosure statements and reorganization plans which stated his partnership interest would be "held by" KEG. Appellant alleges the individuals who drafted these documents knew the difference in legal significance between stating that an interest is to be held by a party, and stating that such partnership interest is to be "cancelled" or "terminated" or "owned thereafter" by a different party. Appellant alleges that under the plans of reorganization, KEG was to hold appellant's partnership interest for his benefit.

Subsequent to the confirmation of the reorganization plans during 1997 to 1999, appellant alleges that he continued to receive annual partnership IRS K-1 income tax statements (K-1 forms) from the limited partnerships indicating that he continued to be a partner in the partnerships. Appellant alleges that these K-1 forms were sent to appellant "by KEG and/or TRIAD or PINNACLE" as co-conspirators and aiders and abettors of the other co-conspirators named in the complaint. Appellant states that these mailings were intended to lull him into believing that he remained a partner in each of the limited partnerships.

In 1999, appellant spoke with Leseney both over the telephone and in person, and Leseney assured him that KEG had and would continue to preserve appellant's economic

8

interests in the limited partnerships. In the summer of 1999, appellant mentioned to Leseney that he doubted he was receiving all of the partnership K-1 forms for each of the limited partnerships. Leseney told appellant not to worry about the missing K-1 forms, but he would talk to Fred Grimm (Grimm) who was then running the partnership on behalf of KEG as the manager under the names of Triad and Pinnacle. Appellant alleges this representation was intended to lull appellant into thinking that all was well.

On or about October 21, 1999, in a telephone conversation with Leseney, appellant inquired as to why he had not heard from Grimm or received the K-1 forms due as of April 15, 1999. Leseney indicated these matters were now being handled by Gilroy in the KEG and First West Corporation offices, and suggested that appellant write to Gilroy to obtain the missing K-1 forms. Appellant wrote to Gilroy the same day requesting the K-1 information. In the letter appellant said he remained a partner in each of the limited partnerships in which KEG became a general partner instead of Citi Equity Group, and requested financial information and the names and addresses of each of the limited partners. Copies of the letter were sent to Leseney and Donald Koll (Koll) at the Koll Company. Gilroy never responded to appellant's letter.

In the summer of 2001, appellant called Leseney at his office and again asked why he was receiving K-1 forms for over a dozen limited partnerships in which KEG had become the general partner and why appellant was not receiving K-1 forms for other limited partnerships in which appellant believed he was a partner. Leseney represented that appellant was still a partner and stated he would check with Grimm. In a telephone call with appellant a few weeks later, Leseney represented that he had spoken with Grimm and that appellant remained a partner. Leseney suggested that appellant write a letter to Grimm and/or Chad Fairborn (Fairborn) at KEG and Triad as they were handling the partnership day-to-day accounting. On June 8, 2001, appellant wrote a letter to Fairborn where he explained he had received partnership forms for the year 2000 from Citi Great Lakes Partners, Citi St. Cloud Partners, Citi West 10 LLC, Citi Columbus Partners IV, and Citi Columbus Partners V. Appellant said he had received no other K-1 forms from KEG or Triad on the remaining partnerships of which he believed he was a

partner.  A copy of the letter was sent to Leseney.  Fairborn did not respond to the letter and did not provide any of the requested K-1 forms.

In the fall of 2001, appellant again expressed to Leseney his concern over not having received K-1 forms for many of the partnerships in which he had been removed as a general partner but his interests were held by KEG.  Appellant told Leseney that he was receiving certain K-1 forms.  Leseney again reassured appellant he was a partner in the partnerships and he had no basis to worry.  Leseney stated that if appellant was not still a partner in all of the partnerships, he would not be receiving K-1 forms as to any of the partnerships.  Leseney represented to appellant that he should not be concerned but that the staff at KEG and Triad had their "heads so far up their ass that they did not know what day it is" and that the accounting and record keeping at KEG and Triad was a mess.

In April of 2002 appellant received K-1 forms from Citi Great Lakes Partners, Citi St. Cloud Partners, Citi West 10 LLC, Citi Columbus Partners IV, and Citi Columbus Partners V, indicating appellant continued to be a partner in these partnerships.

In April of 2003 appellant again told Leseney he had received K-1 forms for some, but not all of the limited partnerships from which he had been removed as general partner.  Leseney once again reassured appellant that his partner interest in each of the partnerships in which KEG was now general partner had been preserved.  Leseney represented that the bankruptcies had been "cookie cutters" in that they were virtually identical to each other and that it would make no sense to argue that appellant was a partner in some but not others.

On April 23, 2003, appellant sent a letter to Grimm and Fairborn at KEG and Triad.  Appellant asserted that he had retained his partnership interests in the partnerships upon his removal, and that he was entitled to the K-1 forms for each of the partnerships in which he had been removed as general partner.  The letter sought financial and limited partner information.  As of early June 2003, neither Grimm nor Fairborn, nor anyone at KEG or Triad, had responded to his letter.

In June of 2003, appellant asked his cousin to contact Leseney to find out what was going on with the partnerships.  During that phone call, Leseney indicated that KEG

was taking the position that appellant was no longer a partner in any of the limited partnerships of which appellant was a removed general partner. Leseney acknowledged this was contrary to the representations that KEG had made since 1995. Leseney suggested that appellant's cousin call Grimm. Grimm then informed appellant's cousin that appellant had been removed from all of the limited partnerships, and that his partnership interest in each of the partnerships had been terminated by the bankruptcy court at the request of the GE entities[6] and as a condition of the GE entities' investment in the limited partnerships. Appellant alleges this was the first time that appellant had ever heard that KEG was taking the position that his economic interest in the limited partnerships had been terminated. On June 17, 2003, appellant wrote a letter to Grimm confirming his understanding that KEG and Triad were of the view that appellant was no longer a partner in any of the limited partnerships from which he had been removed as general partner. The letter was also sent to Ray Wirta (Wirta), Leseney, Koll and Gilroy.

In a letter dated October 13, 2003 to appellant, received on October 17, 2003, Grimm stated: "'You have enclosed with your letter a copy of an agreement you apparently had with The Koll Company. I don't understand the relevance of the document to KEG or the Limited Partnerships. If you believe you have been aggrieved by Koll, you should pursue the matter with them.'" The letter further stated that Grimm did not know why appellant was receiving K-1 forms, and that this was a mistake that would be corrected in future years.[7] The letter confirmed Grimm's position that the bankruptcy reorganizations left appellant with no interest in the partnerships whatsoever.

On November 24, 2003, appellant wrote to Wirta, Leseney, Gilroy, the GE entities, KEG, K/B Fund and/or K/B Fund II, K/B Realty advisors I and II, K/B

---

**6** The "GE entities" are defined in the FAC as: General Electric Capital Corporation, General Electric Commercial Real Estate Services, GE Capital Services and/or General Electric Corporation.

**7** Appellant alleges that despite this representation, he never received any amended K-1 forms from KEG, Triad or Grimm, nor had he received any indication that there was an error in the filing of tax returns by the limited partnerships.

11

Opportunity Investors, and Grimm.  Each of these letters contained a copy of appellant's letter to Grimm, KEG and Triad explaining appellant's legal position, and included an early draft of this lawsuit.  The letter invited each recipient to contact appellant in order to resolve the dispute.

On January 15, 2004, respondent CBRE wrote to appellant denying it was bound by the CNCA.  The letter also stated that "any interests that [appellant] had in the Partnerships whether General or Limited were specifically removed in the Bankruptcy proceedings," and any claim appellant might have was barred by the statute of limitations.

On January 16, 2004, the GE defendants wrote to appellant stating that appellant "has no basis for any claim."

In April 2004 and April 2005, KEG and Triad sent appellant limited partnership K-1 forms.  Appellant does not specify the number of K-1 forms that he received or from which limited partnerships the K-1 forms came.  Appellant admits that "the earliest [appellant] could have known with the exercise of reasonable diligence that he had been damaged by the conduct of KEG and of The Koll Company and of CB Commercial and the other aiders and abettors and conspirators" was on October 17, 2003, the date he received the letter from Grimm.  However, since the K-1 forms continued after this October 13, 2003 letter, appellant was lulled into believing that he remained a partner.  Appellant does not allege he took any steps to confirm this belief or had any further conversations with any of the respondents.

Appellant alleges that due to conduct of employees of the Bureau of Prisons he was prevented from earlier asserting his rights because he was deprived of his legal materials from December 27, 2006 through February 5, 2009.  In addition, appellant was deprived of any access to his California case law materials from December 27, 2006 through January of 2008, and from July of 2008 through April 1, 2010.  The first time appellant had both his legal documents and California case law materials available to him in order to finish preparing his lawsuit was April 1, 2010.

12

## PROCEDURAL HISTORY

Appellant filed his original complaint on April 14, 2010. On August 25, 2010, the CBRE respondents demurred on the grounds that appellant's claims were time-barred and uncertain. On October 7, 2010, appellant responded to the demurrer by filing the FAC.

On November 17, 2010, the CBRE respondents again demurred, challenging the timeliness of appellant's lawsuit. On the same date, the Triad respondents demurred on the same grounds. Appellant opposed the demurrers.

On January 4, 2011, the trial court issued a ruling sustaining the two demurrers. The trial court pointed out that appellant's causes of action accrued at the time that appellant "'discovered or by the exercise of reasonable diligence should have . . . discovered'" the first alleged misappropriation of the information (citing *Forcier v. Microsoft Corp.* (N.D.Cal. 2000) 123 F.Supp.2d 520, 525-527; Civ. Code, § 3426.6). The court found that, "[b]ased on the allegations in the [FAC], the statute of limitations on [appellant's] claims began to run in 2003 *at the very latest.*" (Fn. omitted.) The court pointed to appellant's allegations that in June 2003, he was informed that KEG had taken the position that he was no longer a partner in any of the limited partnerships. The court also analyzed the allegations regarding appellant's 2003 communications, including his inclusion of an early draft of this lawsuit.

The trial court held that appellant's claims are time-barred on the face of the complaint. The court noted that appellant's causes of action were subject to two-, three-, and four-year statutes of limitation. Citing Code of Civil Procedure section 352.1, subdivision (a), the court held that "[e]ven after applying two years of tolling for [appellant's] incarceration, [appellant's] complaint should have been filed by 2009, *at the very latest.*"[8] However, appellant did not file his complaint until April 2010. The trial

---

[8]     Code of Civil Procedure section 352.1, subdivision (a) provides "If a person entitled to bring an action, mentioned in Chapter 3 (commencing with Section 335), is, at the time the cause of action accrued, imprisoned on a criminal charge, or in execution under the sentence of a criminal court for a term less than for life, the time of that disability is not a part of the time limited for the commencement of the action, not to exceed two years."

court rejected appellant's claims of delayed discovery, fraudulent concealment, and equitable tolling.

On February 15, 2011, the court entered judgments in favor of the CBRE respondents and the Triad respondents.

On March 16, 2011, the GE respondents filed their own demurrer challenging the timeliness of appellant's lawsuit. The GE respondents argued that appellant admitted that he discovered his alleged causes of action no later than 2003, and that he failed to establish fraudulent concealment or grounds for equitable tolling. On April 14, 2011, the trial court sustained the GE respondents' demurrer in its entirety without leave to amend. The court reiterated that appellant "was on notice of his claims by 2003, when he received Grimm's letter, prepared a draft complaint, and sent copies of the draft complaint to certain [respondents], including the GE Entities." The court again rejected appellant's arguments that his claims were subject to delayed discovery, fraudulent concealment, or equitable tolling. On May 9, 2011, the trial court entered judgment of dismissal in favor of the GE respondents.

On April 22, 2011, appellant appealed from the final judgments entered in favor of the CBRE respondents and the Triad respondents, and from the ruling sustaining the GE respondents' demurrer without leave to amend.[9]

## DISCUSSION

### I. Standard of review

On appeal from a judgment of dismissal after a demurrer is sustained without leave to amend, we review the legal sufficiency of the complaint de novo. (*Montclair Parkowners Assn. v. City of Montclair* (1999) 76 Cal.App.4th 784, 790.) "The reviewing

---

[9]    Orders sustaining demurrers are generally not appealable. (*Hill v. City of Long Beach* (1995) 33 Cal.App.4th 1684, 1695.) An appeal can be taken after entry of such an order only after the court enters an order of dismissal. (*Ibid.*) However, "an appellate court may deem an order sustaining a demurrer to incorporate a judgment of dismissal. [Citation.]" (*Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916, 920.) While the judgment dismissing the GE respondents was not final at the time that appellant filed this appeal, we find it appropriate to deem the judgment included in the order and consider appellant's appeal from the GE respondents' demurrer on the merits.

14

court gives the complaint a reasonable interpretation, and treats the demurrer as admitting all material facts properly pleaded. [Citations.] The court does not, however, assume the truth of contentions, deductions or conclusions of law. [Citation.] The judgment must be affirmed 'if any one of the several grounds of demurrer is well taken. [Citations.]' [Citation.] However, it is error for a trial court to sustain a demurrer when the plaintiff has stated a cause of action under any possible legal theory. [Citation.] And it is an abuse of discretion to sustain a demurrer without leave to amend if the plaintiff shows there is a reasonable possibility any defect identified by the defendant can be cured by amendment. [Citation.]" (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 966-967.)

## II. Appellant's causes of action are time-barred on the face of the FAC

### A. Applicable law

Statutes of limitation "'prescribe the periods beyond which' a plaintiff may not bring a cause of action. [Citation.]" (*Norgart v. Upjohn Company* (1999) 21 Cal.4th 383, 395 (*Norgart*).) The purpose of these statutes is to protect defendants from the claims of dilatory plaintiffs, and to stimulate plaintiffs to assert fresh claims against defendants in a diligent fashion. (*Ibid.*) The statute of limitations operates in an action as an affirmative defense. (*Id.* at p. 396.) Under the statute of limitations, a plaintiff must bring a cause of action within the limitations period applicable thereto after accrual of the cause of action. (*Id.* at p. 397.)

"The general rule for defining the accrual of a cause of action sets the date as the time 'when, under the substantive law, the wrongful act is done,' or the wrongful result occurs, and the consequent 'liability arises.' [Citations.]" (*Norgart, supra*, 21 Cal.4th at p. 397.) "In other words, it sets the date as the time when the cause of action is complete with all of its elements. [Citations.]" (*Ibid.*)

An important exception to the general rule for defining the accrual of a cause of action is the discovery rule. (*Norgart, supra*, 21 Cal.4th at p. 397.) The discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action. [Citations.]" (*Ibid.*) A plaintiff discovers a cause of action

15

when he at least *suspects* a factual basis, as opposed to a legal theory, for its elements. (*Ibid*.) The plaintiff "has reason to suspect" when he has """""notice or information of circumstances to put a reasonable person *on inquiry*.""""" (*Id.* at p. 398.) The plaintiff need not know "'specific "facts" necessary to establish' the cause of action; rather, he may seek to learn such facts through the 'process contemplated by pretrial discovery'; but, within the applicable limitations period, he must indeed seek to learn the facts necessary to bring the cause of action in the first place -- he 'cannot wait for' them 'to find' him and 'sit on' his 'rights'; he 'must go find' them himself if he can and 'file suit' if he does. [Citation.]" (*Ibid*., fn. omitted.)

Where the facts are undisputed, the accrual of a cause of action may be determined as a matter of law. (*Thomas v. Canyon* (2011) 198 Cal.App.4th 594, 604.)

### B. Accrual of appellant's causes of action

Appellant's causes of action all revolve around the respondents' alleged misuse of confidential information under the CNCA. Respondents allegedly misused this information to acquire the limited partnerships, remove appellant as general partner, and deny appellant any remaining partnership interest.

The allegations of the FAC show that appellant had reason to suspect -- and did, in fact, suspect -- facts which put him on inquiry notice of his claims as early as 1999, when he admittedly expressed to Leseney his concerns that he was not receiving all the K-1 forms to which he was entitled if he still had a partnership interest in the limited partnerships. In October of that year, appellant expressed to Leseney his concern that he had not heard from Grimm or received requested partnership information. Despite Leseney's assurances, appellant had reason to suspect the alleged wrongdoing -- and indeed, did suspect it, as evidenced by his repeated inquiries in the following years.

However, even assuming that Leseney's reassurances were enough to dismiss the suspicions of a reasonable person, the allegations of the FAC show that appellant was on notice of his claims no later than 2003. In June of that year, appellant was informed of Grimm's position that appellant had been removed from all of the limited partnerships, and that his interest in each of the partnerships had been terminated by the bankruptcy

16

court as a condition of the GE entities' investment in the limited partnerships. Appellant acknowledges that he then understood that it was KEG's position that his economic interest in the limited partnerships had been terminated. On June 17, 2003, appellant wrote a letter to Grimm, copying several other respondents, confirming his understanding that KEG and Triad were taking the position that appellant was no longer a partner in any of the limited partnerships from which he had been removed as general partner.

As of June 2003, appellant was on notice of his claims, and had an affirmative obligation to discover the facts supporting his causes of action. (*Norgart, supra*, 21 Cal.4th at p. 398.)

Code of Civil Procedure section 352.1, subdivision (a) permits an individual such as appellant, who is imprisoned at the time his cause of action accrues, an additional period of time to file his lawsuit while he is under the "disability" of imprisonment. This period of time may not exceed two years. Thus, under the allegations in the complaint, and taking into consideration appellant's incarceration, the statutes of limitation relevant to appellant's causes of action began to run no later than June 2005.[10] Appellant filed his original complaint in April 2010.

### C. Each cause of action is barred under the relevant statute of limitations

Appellant filed 10 causes of action against the respondents. Each cause of action arises from the same set of facts, culminating in appellant's acknowledgment in June 2003 that he understood that respondents were taking the position that he no longer had an interest in any of the limited partnerships.

---

[10]     In his reply brief, appellant notes that he recently learned that certain respondents -- it is unclear which ones -- listed him as a partner as recently as 2008, although appellant did not receive the relevant K-1 and IRS 1065 forms. This information is irrelevant to the question of when appellant's causes of action accrued. The accrual of appellant's causes of action occurred when he had notice or information of circumstances to put a reasonable person on inquiry notice of his claims. Information outside of appellant's knowledge has no bearing on this question.

17

Appellant's causes of action have different applicable statutes of limitation. Therefore, we discuss each cause of action separately, and conclude that each cause of action is barred as a matter of law.

### 1. First cause of action for breach of written contract

A cause of action for breach of written contract is subject to a four-year statute of limitations. (Code Civ. Proc., § 337.) Under the facts pled in the FAC, appellant's cause of action for breach of written contract had to be filed no later than June 2009. Appellant's April 2010 filing is untimely.

### 2. Second cause of action for fraud

A cause of action for fraud is subject to a three-year statute of limitations. (Code Civ. Proc., § 338, subd. (d).) Under the facts pled in the FAC, appellant's cause of action for fraud had to be filed no later than June 2008. Appellant's April 2010 filing is untimely.

### 3. Third cause of action for violation of Uniform Trade Secrets Act

A cause of action for violation of the Uniform Trade Secrets Act is subject to a three-year statute of limitations. (Civ. Code, § 3426.6 ["An action for misappropriation must be brought within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered"].) Under the facts pled in the FAC, this case of action should have been filed no later than June 2008. Appellant's April 2010 filing is untimely.

### 4. Fourth cause of action for breach of confidential relation and fifth cause of action for breach of fiduciary duty

Appellant's fourth and fifth causes of action are subject to a four-year statute of limitations. (Code Civ. Proc., § 343; *Thomson v. Canyon, supra*, 198 Cal.App.4th at p. 606 ["The Code of Civil Procedure does not specify a statute of limitations for breach of fiduciary duty. The cause of action is therefore governed by the residual four-year statute of limitations in Code of Civil Procedure section 343"].) Under the facts pled in the FAC, these causes of action had to be filed no later than June 2009. Appellant's April 2010 filing is untimely.

**5. Sixth cause of action for tortious interference with contract and seventh cause of action for tortious interference with prospective economic advantage**

A two-year statute of limitations is applicable to appellant's sixth cause of action for tortious interference with contract and seventh cause of action for tortious interference with prospective economic advantage. (Code Civ. Proc., § 339.) Under the facts pled in the FAC, these causes of action had to be filed no later than June 2007. Appellant's April 2010 filing is untimely.

**6. Eighth cause of action for declaratory relief**

A cause of action for declaratory relief is governed by the limitation period applicable to an ordinary legal or equitable action based on the same claim. (*Mangini v. Aerojet-General Corp.* (1991) 230 Cal.App.3d 1125, 1155.) Here, at most, the applicable statute of limitations would be four years. Under the facts pled in the FAC, this cause of action had to be filed no later than June 2009. Appellant's April 2010 filing is untimely.

**7. Ninth cause of action under RICO**

A four-year statute of limitations is applicable to appellant's ninth cause of action. (*Agency Holding Corp. v. Malley-Duff & Associates, Inc.* (1987) 483 U.S. 143, 156.) Under the facts pled in the FAC, this cause of action should have been filed no later than June 2009.[11] Appellant's April 2010 filing is untimely.

**8. Tenth cause of action for fraudulent transfer**

The statute of limitations applicable to a fraudulent transfer is "four years after the transfer or, if later, one year after the transfer was or could reasonably have been discovered by the claimant, up to a maximum of seven years after the transfer [citation]." (*Monastra v. Konia Business Machines, U.S.A., Inc.* (1996) 43 Cal.App.4th 1628, 1645; Civ. Code, § 3439.09.)

---

[11] Appellant argues that a civil RICO claim runs from the last predicate act in furtherance of the alleged wrong. This is incorrect. A civil RICO claim accrues based on the discovery rule, "starting the clock when a plaintiff knew or should have known of his injury." (*Rotella v. Wood* (2000) 528 U.S. 549, 553.)

Appellant's fraudulent transfer claim is based on his allegation that respondent KEG fraudulently transferred and assigned the $85 million in promissory notes, and improperly secured the notes against the assets of the limited partnerships. This transfer and securing of the promissory notes occurred in August through December 1995. Appellant discovered the basis for his claims no later than June 2003. Applying the two-year tolling under Code of Civil Procedure section 352.1, subdivision (a), and the one year permitted under Civil Code section 3439.09, this cause of action should have been filed no later than June 2006. Appellant's 2010 filing is untimely.

## III. The facts alleged in the FAC do not permit tolling of the applicable statutes of limitation under any of appellant's theories

Appellant has set forth several theories as to why his causes of action should not be barred under the applicable statutes of limitation. We address each of appellant's theories below, and conclude that there is no authority for further tolling or suspending of the statutes of limitation in this case.

### A. Delayed discovery rule

Appellant's first argument is that the delayed discovery rule should be applied to delay the accrual of his causes of action until April 15, 2006. While appellant acknowledges the information he received in 2003 made him suspicious of the alleged wrongdoing set forth in the FAC, he states that he exercised reasonable diligence in acting upon these suspicions. He wrote to Grimm/KEG/Triad on June 17, 2003, and did not receive a response to his letter. He then received K-1 forms on April 15, 2004, and "reasonably believed Grimm rethought his position and that [appellant] would not be receiving the K-1's if he was not still a partner." Appellant claims he also "reasonably believed his non-receipt of any amended K-1 forms or amended tax returns deleting [appellant] as a partner meant [appellant] remained a partner." Again on April 15, 2005, appellant received K-1 forms, indicating that he was not damaged. Appellant claims that it was not until April 15, 2006, when he did not receive any K-1 forms, that he knew or could have known through the exercise of reasonable diligence that he had been damaged.

20

### 1.  Relevant law and application to the facts

The delayed discovery rule "postpones accrual of a cause of action until the plaintiff discovers, or has reason to discover, the cause of action." (*Norgart, supra*, 21 Cal.4th at p. 397.)  "[T]he plaintiff discovers the cause of action when he at least suspects a factual basis, as opposed to a legal theory, for its elements, even if he lacks knowledge thereof -- when, simply put, he at least 'suspects . . . that someone has done something wrong' to him.  [Citation.]" (*Ibid.*)

In *Norgart*, for example, the plaintiffs sued a pharmaceutical company for wrongful death after the suicide of their daughter.  The plaintiffs alleged that six years before the filing of their complaint, their daughter had committed suicide by intentional overdose of prescription drugs including a drug manufactured and distributed by the defendants.  The plaintiffs alleged that the drug was unreasonably dangerous.  The defendants invoked the applicable statute of limitations, which were one year for wrongful death and three years for fraud. (*Norgart, supra*, 21 Cal.4th at p. 390.)

The plaintiffs admitted at the time of their daughter's death, they "'thought'" that "'there had to be some reason, other than just herself, that would cause her to commit suicide,'" that "'there had to be some other force or action upon her that caused her to commit suicide . . . .'" (*Norgart, supra*, 21 Cal.4th at p. 392.)  However they claimed not to have realized the dangerous propensities of the drug at issue until they learned about it in the news media in 1991. (*Id.* at p. 390.)

The *Norgart* court held that plaintiffs' claims were barred by the applicable statutes of limitation. (*Norgart, supra*, 21 Cal.4th at pp. 405-406.)  Pursuant to the discovery rule, the plaintiffs' causes of action "accrued when they came at least to suspect, or have reason to suspect, a factual basis for their elements." (*Id.* at p. 405.)  That happened within a year of their daughter's death, at the time that her father "formed a belief that an 'individual or individuals . . . did something wrong to [her] that caused her to take her own life,' and had begun to contemplate bringing an action for wrongful death." (*Id.* at p. 406.)

21

As set forth above, appellant suspected wrongdoing no later than 2003, and contemplated filing a lawsuit. It was then his causes of action accrued. Appellant makes several arguments as to why his receipt of K-1 forms in 2004 and 2005 delayed his discovery until April 2006. As set forth below, those arguments are not legally supportable and must be rejected as a matter of law.

## 2. Legal significance of K-1 forms

Appellant argues that a K-1 form is a representation made under penalty of perjury that the person listed in the K-1 form is in fact a partner in the partnership. It is a piece of paper that is to be relied upon by the person listed in the K-1 form in the preparation of his IRS Form 1040. Appellant argues that his receipt of the K-1 forms in 2005 and 2006 was "powerful proof" that appellant remained a partner.

The receipt of the K-1 forms could not undo the onset of the running of the statute of limitations. An individual may not reasonably rely on false information contained in a K-1 form. (*David v. Commissioner* (2d Cir.1995) 43 F.3d 788, 789-790 [in investing in oil and gas partnerships, plaintiff's reliance on partnership returns and K-1 schedules prepared by accountants was not reasonable]; see also *Thompson v. Central Ohio Cellular* (Ohio App. 1994) 639 N.E.2d 462, 471-472, ["[N]o justifiable reliance can be shown on . . . allegedly false representations contained in the IRS Schedule K-1. . . any claimed reliance on the Schedule K-1, as a matter of law, cannot be considered justifiable"].) Here, appellant was specifically informed in October 2003 that the K-1 forms he was receiving were sent to him in error. In addition, he had previously been told that the staff at KEG and Triad had their "heads so far up their ass that they did not know what day it is," and that the accounting and record keeping at these partnerships was a mess. Under the circumstances, he could not justifiably rely on the K-1 forms sent to him in 2004 and 2005. Nor could he reasonably rely on the fact that he did not receive any amended K-1 form reflecting an alleged error. He had been told unequivocally that he was no longer considered to have any partnership interest.

Furthermore, appellant's emphasis on the legal significance of the K-1 forms may be used against him. Appellant admits that he was not receiving K-1 forms for all the

22

partnerships in which he believed he had a partnership interest. Appellant was sufficiently concerned that he asked Leseney repeatedly why he was not receiving K-1 forms from the other partnerships. At the time he began to suspect, appellant was required to "seek to learn the facts." (*Norgart , supra*, 21 Cal.4th at p. 398.) If he was not receiving such a significant document from every partnership in which he believed he still had an interest, he had reason for far more than a suspicion of wrongdoing. This is especially true after he learned of Grimm's position that appellant no longer had an interest in any of the limited partnerships.

### 3. The concept that actions speak louder than words

In response to the trial court's emphasis on the fact that no representations at all were made to appellant after 2003, appellant argues that California accepts the "common sense concept that 'actions speak louder than words' [and that] [w]ords are frequently but an imperfect medium to convey thought and intention." (*Crestview Cemetery Assn. v. Dieden* (1960) 54 Cal.2d 744, 753-754 (*Crestview*).) Appellant again insists the K-1 forms he received in 2004 and 2005 were representations that he remained a partner in the partnerships and had not been damaged.

Appellant cites several cases in support of his argument that actions speak louder than words. However, he does not cite any authority suggesting that this concept has ever been applied to suspend the running of a statute of limitations once the potential plaintiff has reason to suspect the wrongdoing at issue. In *Crestview*, the only California authority appellant cites in support of this argument, the adage was used to aid in the interpretation of an ambiguous contract. The court explained, "even if it be assumed that the words standing alone might mean one thing to the members of this court, where the parties have demonstrated by their actions and performance that to them the contract meant something quite different, the meaning and intent of the parties should be enforced." (*Crestview, supra*, 54 Cal.2d at p. 754.) We are not dealing with an ambiguous contract. We are facing the question of when a statute of limitations began to run. It commenced running at the time that appellant had reason to suspect the factual

23

basis for his claims -- regardless of whether he subsequently received information hinting that his suspicions might not be valid.

The other controlling case law cited by appellant on this topic is irrelevant. (See *Dickerson v. United States* (2000) 530 U.S. 428, 461 (dis. opn. of Scalia, J. and Thomas, J.) [suggesting that although the majority will not admit it, they are creating an "extraconstitutional Constitution"]; *District of Columbia v. Murphy* (1941) 314 U.S. 441, 456 [considering question of whether individual was domiciled in the District of Columbia, indicating that consideration can be given to the individual's intention but on the question of domicile, "inconsistent acts" can alter the analysis].) In sum, appellant has not convinced us that the saying "actions speak louder than words" may be applied to undo the commencement of the statute of limitations.

## B. Equitable tolling

Appellant next argues that he is entitled to equitable tolling based on his allegation that he was deprived of his legal materials in this case and access to his California case law and statutory law from December 27, 2006 until April 1, 2010, due to the conduct of the Federal Bureau of Prisons. For the reasons set forth below, we find that appellant has not set forth allegations giving rise to equitable estoppel as a matter of law.

### 1. Applicable law

A plaintiff must plead three elements to invoke equitable estoppel: (1) the defendant must have had timely notice of the claim; (2) the defendant must not be prejudiced by being required to defend the otherwise barred claim; and (3) the plaintiff's conduct must have been reasonable and in good faith. (*Addison v. State* (1978) 21 Cal.3d 313, 319.) Generally speaking, the doctrine of equitable tolling applies "'"[w]hen an injured person has several legal remedies and, reasonably and in good faith, pursues one."' [Citations.]" (*McDonald v. Antelope Valley Community College Dist.* (2008) 45 Cal.4th 88, 100; see also *Aguilera v. Heiman* (2009) 174 Cal.App.4th 590, 598 ["The equitable tolling doctrine rests on the concept that a plaintiff should not be barred by a statute of limitations unless the defendant would be unfairly prejudiced if the plaintiff were allowed to proceed. . . . '[T]he primary purpose of the statute of limitations is

24

normally satisfied when the defendant receives timely notification of the first of two proceedings'"]; *Hu v. Silgan Containers Corp.* (1999) 70 Cal.App.4th 1261, 1270 ["In the majority of cases in which courts apply the equitable tolling doctrine, the plaintiff possesses several legal remedies, and reasonably and in good faith pursues one"].)  In the "carefully considered situations" in which the California Supreme Court has approved equitable tolling, the plaintiff was pursuing an equitable remedy such as another lawsuit, an administrative claim, or a request that an insurer investigate and pay the claim.  (See *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 370 [cataloging cases].)

The United States Supreme Court has held that the concept of equitable tolling may be applied in serious instances of attorney misconduct amounting to "extraordinary circumstances" which cause an untimely filing.  (*Holland v. Florida* (2010) 560 U.S. 631, 2563 [remanding case to determine whether state prisoner's attorney's conduct rose to level of "extraordinary circumstance" sufficient to permit equitable tolling of the one-year statute of limitations for federal habeas corpus petitions].)

### 2. Appellant has failed to plead the elements of equitable tolling

Under the facts pled in the FAC, appellant has failed to set forth the required elements of equitable estoppel.  As set forth above, appellant's claims accrued in 2003.  As appellant admits, one of the elements of equitable tolling is reasonable and good faith conduct.  Appellant offers no reason why he did not file his lawsuit between June 2003 and December 2006, when his legal materials and file were allegedly taken from him.  This three-year delay is unreasonable, especially considering that appellant had a draft complaint already prepared in 2003.

Appellant is asking that the courts apply a seven-year period of equitable tolling: June 2003 to April 2010.  Yet he points to no case law suggesting that a seven-year period of equitable tolling has ever been considered appropriate.

Under the circumstances, appellant has failed as a matter of law to plead facts giving rise to equitable tolling.[12]

## C. Estoppel by conduct/equitable estoppel

Appellant argues that he has pled that respondents' conduct estops respondents from both asserting he was not a partner and from asserting a statute of limitations defense. Specifically, appellant argues that respondents' conduct of sending him K-1 forms during the period 1996 to 2003, and again in 2004 and 2005, lulled him into foregoing action to assert his rights earlier.

Equitable estoppel ""'comes into play after the limitations period has run'"" and addresses ""'the circumstances in which a party will be estopped from asserting the statute of limitations as a defense to an admittedly untimely action because his conduct has induced another into forbearing suit within the applicable limitations period.'"" (*Lantzy v. Centex Homes, supra*, 31 Cal.4th at p. 383.) In other words, "'[t]o create an equitable estoppel, "it is enough if the party has been induced to *refrain* from using such means or taking such action as lay in his power, by which he might have retrieved his position and saved himself from loss.". . . " . . . Where the delay in commencing action is induced by the conduct of the defendant it cannot be availed of by him as a defense.'"

---

[12]     Respondents have raised the issue of whether equitable tolling based on circumstances of incarceration can lawfully be applied by the courts in light of the statutory tolling set forth in Code of Civil Procedure section 352.1, subdivision (a). Respondents point out that generally, judge-made doctrines such as equitable tolling should not apply if "'inconsistent with the text of the relevant statute' . . . or contravenes clear legislative policy." (*Lantzy v. Centex Homes, supra*, 31 Cal.4th at p. 371.) In other words, respondents argue, equitable tolling should not be applied to undermine legislative policy where an applicable statute "signifies an intent to restrict the doctrine of equitable tolling." (*Bjorndal v. Superior Court* (2012) 211 Cal.App.4th 1100, 1112; *JPMorgan Chase Bank, N.A. v. City and County of San Francisco* (2009) 174 Cal.App.4th 1201, 1212-1214.) Appellant points out that no California court has ever decided the question of whether equitable tolling due to conditions of imprisonment is foreclosed by the statutory tolling found in Code of Civil Procedure section 352.1, subdivision (a). Because we have found that appellant has failed to allege the elements of equitable tolling, we decline to reach this issue.

26

[Citations.]" (*Vu v. Prudential Property & Casualty Ins. Co.* (2001) 26 Cal.4th 1142, 1153.)

However, the doctrine of equitable estoppel only applies if "the plaintiff proceeds diligently once the truth is discovered." (*Lanzty v. Centex Homes, supra*, 31 Cal.4th at p. 384.) Thus, the plaintiff must bring his action within a reasonable time after the estoppel has expired. (*Regus v. Schartkoff* (1957) 156 Cal.App.2d 382, 387.) "When a substantial period for instituting an action supervenes after expiration of the delay engendered by a party, his conduct, representations, or promise will not estop him from asserting the bar of the statute." (*Ibid.*)

Here, appellant cannot claim he was induced into forbearing from filing his lawsuit any later than 2003. At that time, he was told point blank of the respondents' position that appellant held no interest in any of the partnerships. As set forth above, any alleged reliance on 2004 and 2005 K-1 forms was unreasonable as a matter of law. (See *Grisham v. Philip Morris U.S.A., Inc.* (2007) 40 Cal.4th 623, 637 (*Grisham*) [the "defendant's fraud in concealing a cause of action against him will toll the statute of limitations, and that tolling will last as long as a plaintiff's reliance on the misrepresentations is *reasonable*" (italics added)].)[13] Although appellant had arguably been led along by Leseney's assurances up until 2003, after that time he could no longer claim to have been lulled into forbearing from filing suit. The subsequent seven-year delay cannot be considered a "reasonable time." (*Regus v. Schartkoff, supra*, 156 Cal.App.2d at p. 387.) Instead, it was a "substantial period" of time, foreclosing appellant's assertion of equitable estoppel.[14]

---

[13] As set forth in *Grisham, supra*, 40 Cal.4th at page 637, the question of whether reliance was reasonable is normally a question of fact for the jury. However, it "'may be decided as a matter of law only if the facts permit reasonable minds to come to just one conclusion.'" (*Ibid.*) In this case, we find that after appellant was told that respondents were taking the position he had no interest in the partnerships, any reliance on the receipt of form K-1 was unreasonable as a matter of law.

[14] *Gervase v. Superior Court* (1995) 31 Cal.App.4th 1218 (*Gervase*), relied upon by appellant, is factually distinguishable. In *Gervase* the plaintiffs invested in risky limited

### D. Fiduciary relationship/duty to speak

Appellant next argues that he relied upon the honesty, integrity, representations, and good faith of fiduciaries or persons in a confidential relationship with him. Further, appellant argues, a general partner owes other partners a fiduciary duty. (*Leff v. Gunter* (1983) 33 Cal.3d 508, 514.) Thus KEG, as the general partner and tax matters partner, owed a fiduciary duty to the other partners.

Appellant argues that he has pled that despite respondents' position that appellant was not a partner, they kept reassuring him he did remain a partner. In addition, the respondents kept sending appellant K-1 forms, representing that he remained a partner. Appellant cites *United States Liability Ins. Co. v. Haidinger-Hayes, Inc.* (1970) 1 Cal.3d 586, 598, for the proposition that "[w]here a fiduciary relationship exists the usual duty of diligence to discover facts does not exist." Appellant explains that this is because a fiduciary has a duty of "full and fair disclosure to the beneficiary of all facts which materially affect his rights and interests." (*Neel v. Magana, Olney, Levy, Cathcart & Gelfand* (1971) 6 Cal.3d 176, 189.) Thus, a tolling of the statute of limitations during the time that the fiduciary relationship exists "prevents the fiduciary from obtaining immunity for an initial breach of duty by a subsequent breach of the obligation of disclosure." (*Ibid.*)

Appellant cannot assert he held a reasonable belief that any respondent owed him a fiduciary duty after June 2003, when Leseney informed appellant that KEG took the

---

partnerships. It was represented to them that the investments were safe and as secure as a certificate of deposit, with a far better return. Brokers were told to disregard the prospectuses and rely on fact sheets prepared by the investment group. These fact sheets failed to disclose the risky nature of the investments. In addition, the plaintiffs were mailed monthly statements which failed to disclose the decline in the value of the investments. Although the investments were made during 1984 through 1988, the plaintiffs did not discover the true facts until 1992, when the statements began to carry the disclaimer that the face amounts did not reflect current value. (*Id.* at pp. 1226-1228.) The case does not specifically discuss the relevant dates for the applicable statutes of limitation, but the appellate opinion was filed in January 1995, thus it is clear that in contrast to the situation before us, the plaintiffs did not allow seven years to pass before filing their complaint.

position that appellant was no longer a partner in any of the limited partnerships of which appellant was a removed general partner. In June 2003, and no later, any alleged fiduciary relationship expired and appellant was obligated to discover the facts supporting the causes of action that he suspected he had against the respondents. Because his complaint was not filed until April 2010, the alleged fiduciary duty, or duty to speak, that any of the respondents might have had does not serve to save his causes of action.

### E. *Continuing violation rule*

Appellant asserts that where a contract is continuing in nature, there may be a continuing violation. Thus where there is a periodic new injury to the plaintiff, the courts apply a theory of continuous accrual. (*Howard Jarvis Taxpayers Assn. v. City of La Habra* (2001) 25 Cal.4th 809, 818-819.) Appellant argues that situations where the continuing violation rule has been applied include disputes arising out of installment contracts (*Bank of America Nat'l Trust & Sav. Asso. v. McLaughlin* (Cal. App. Dep't Super. Ct. 1957) 152 Cal.App.2d Supp. 911, 915); leases with periodic rental payments (*Tsemetzin v. Coast Federal Savings & Loan Assn.* (1997) 57 Cal.App.4th 1334, 1344); and contracts calling for pension-like payments (*Conway v. Bughouse, Inc.* (1980) 105 Cal.App.3d 194, 199). Appellant argues that a partnership is a kind of continuing contract which requires the general partner to send the annual K-1 form to each partner. Thus, with each K-1 form that he received, appellant argues, the statute of limitations started again.

The continuing violation doctrine permits recovery "'for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct within the limitations period[.]' [Citation.]" (*Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 343 (*Komarova*).) "'The key is whether the conduct complained of constitutes a continuing pattern and course of conduct as opposed to unrelated discrete acts. If there is a pattern, then the suit is timely if "the action is filed within one year of the most recent [violation]" [citation], and the entire course of conduct is at issue.' [Citation.]" (*Ibid.*)

29

Appellant has not alleged facts that show a continuing violation. His causes of action are based on the breach of the CNCA, a transfer of debt, and a loss of partnership interests that he believed were protected. Appellant's causes of action are *not* based on any misrepresentations made in any K-1 form. Nor are they based on the wrongful mailing of K-1 forms. The mailing of the K-1 forms in 2004 and 2005 is not "sufficiently linked" to the alleged wrongful conduct within the limitations period. *Komarova, supra*, 175 Cal.App.4th at p. 343.) No continuing violation was alleged as a matter of law.

### F. *Last overt act of the conspiracy rule*

Finally, appellant argues that the last overt act in furtherance of a conspiracy against him was on or after April 15, 2005, the date the last K-1 forms were sent to appellant. Appellant asserts that when a conspiracy is alleged, the statute of limitations does not begin to run until the last overt act has been completed. (*Wyatt v. Union Mortgage Co.* (1979) 24 Cal.3d 773, 786; *Schessler v. Keck* (1954) 125 Cal.App.2d 827, 832-833.) The complaint alleges a conspiracy to carry out the acts complained of, and the last overt act alleged in the complaint was the mailing of the K-1 forms to appellant on April 15, 2005. Since appellant filed the complaint on April 14, 2010, and since he is entitled to two years of statutory tolling under Code of Civil Procedure section 352.1, subdivision (a), appellant argues, the complaint is timely filed.

In order for the last overt act doctrine to apply, appellant must allege that the respondents "continue[d] to commit wrongful acts in furtherance of a conspiracy to harm another." (*Wyatt v. Union Mortgage Co., supra*, 24 Cal.3d at p. 787.) Again, we find that the mailing of the K-1 forms by certain respondents does not constitute a wrongful act in furtherance of the alleged conspiracy. The primary objects of the alleged conspiracy were to remove appellant as partner and transfer certain debt obligations in an allegedly fraudulent manner. Any alleged mailing of K-1 forms did nothing to further this alleged conspiracy. In fact, the 2004 and 2005 K-1 form mailings took place long after the alleged object of the conspiracy had been carried out. (See *State of California ex rel. Metz v. CCC Information Services, Inc.* (2007) 149 Cal.App.4th 402, 419 ["the most recent acts alleged by [plaintiff] do not qualify as overt acts because they were

30

made after the primary purpose of the alleged conspiracy had been realized"].)  Under the facts pled in the FAC, the mailing of K-1 forms in 2004 and 2005 cannot be considered wrongful acts in furtherance of the conspiracy.  Appellant's conspiracy theory, like his other theories, cannot prevent the dismissal of his causes of action as a matter of law on the grounds that they are barred by the applicable statutes of limitation.

## DISPOSITION

The judgments are affirmed.  The CBRE respondents' request for judicial notice is denied.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
           CHAVEZ

We concur:


_____, P. J.
BOREN


_____, J.
ASHMANN-GERST

31