Filed 1/5/15  Afra v. Artech Properties CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| FARID AFRA, as Administrator, etc., | B250073 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. SC100292) |
| v. | |
| ARTECH PROPERTIES, LLC et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Gerald Rosenberg, Judge.  Affirmed.

Law Offices of Saul Reiss, Saul Reiss and Firouzeh Simab, for Plaintiff and Appellant.

Hill, Farrer & Burrill, Michael K. Collins and Neil D. Martin, for Defendants and Respondents, Artech Properties, LLC and Eskandar Hakakian.

_____

Farid Afra, acting as the administrator of the Farid Afra Profit Sharing Plan, loaned $1 million to Ezri Namvar and his company, Namco Capital Group, Inc., in July 2008. Based on Namvar's statements and the documents provided, Afra believed his loan was secured by an assignment of a 25 percent participation in a $4.3 million promissory note from Namvar to Eskandar Hakakian's family business, Artech Properties LLC (the Artech note). The Artech note was secured by a deed of trust on a commercial building in Artesia wholly owned by Artech Properties. Notwithstanding Hakakian's delivery to Namvar of fully executed loan documents, however, Namco never funded the Artech loan, a fact that was not disclosed to Afra. As a consequence, Afra's purported security was worthless. Namvar and Namco were forced into involuntary bankruptcy soon thereafter, and Afra never recovered his $1 million.[1]

Afra sued Namvar, Namco, Artech Properties and Hakakian seeking return of his $1 million. Afra proceeded to trial against Hakakian and Artech Properties contending, in part, they were estopped from denying the validity of the Artech note. After a bench trial the court entered judgment in favor of Hakakian and Artech Properties. The court also awarded $120,000 in attorney fees to Artech Properties. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *The Underlying Loan Transactions*

In June 2008 Hakakian knew Namvar was having cash-flow problems and needed infusions of cash to maintain his business. Hakakian told Namvar potential investors were reluctant to lend Namvar money without security for those investments but said that he (Hakakian) trusted Namvar and wanted to help him. In a conversation with Namvar's brother, Moussa, Hakakian told Moussa he had a building in Artesia he could make

---

[1] Namvar, for many years a hard money lender to affluent members of the Persian Jewish community in Los Angeles, purportedly held assets of more than $2 billion when the economy sharply contracted in 2008. Unable to meet their obligations to a wide range of creditors, Namvar and Namco were forced into bankruptcy. Following the bankruptcy Namvar was prosecuted for federal wire fraud and sentenced to seven years in prison for his role in the Namco Ponzi scheme.

available for Namvar to use as collateral for future loans. Moussa told Hakakian not to do so.

Undeterred, Hakakian asked Namvar to lend him $4.3 million secured by a deed of trust on the Artesia building. Hakakian testified he was surprised when he learned the loan had been approved in early July 2008. There was no escrow agent for the transaction; Hakakian signed the loan documents, including a promissory note, a deed of trust, an assignment of leases and a personal guarantee of the debt, on July 10, 2008 at Namco's office in Beverly Hills. The Artech note provided, "Payments on this Note shall be due and payable commencing on the first calendar day of the first calendar month following the funding of this Note, and continuing on the first day of each successive calendar month . . . ." The Artech note further granted the lender the right to transfer or assign all or any part of the note. According to Hakakian, he did not read the documents before signing them because he trusted Namvar and left without receiving a check or other conveyance of the $4.3 million.

Several days later Afra, accompanied by a friend, Nasser Zaghi, visited Namco to discuss investing funds in one of its projects. Namvar offered Afra and Zaghi an investment return of 8 percent on loans of $1 million, supported by promissory notes personally guaranteed by Namvar (the Namco note) and, as security for the loan, assignment of a 25 percent interest in the Artech note to each of them. Afra and Zaghi accepted the proposed deal, and each loaned Namco $1 million. Before sending the money Afra and Zaghi visited the property to ensure its value but did not have an attorney review the documents or ask whether the Artech loan had ever been funded. Neither Afra nor Zaghi contacted Hakakian to discuss the loan or the property.

On July 21, 2008 Namco recorded the Artech deed of trust. On August 5, 2008 Namco recorded a collateral assignment of the Artech deed of trust in favor of Afra and Zaghi's company, Park General, Inc. There is no evidence in the record Hakakian was informed of these events at the time.

On August 29, 2008, troubled by rumors of Namvar's illiquidity, Afra demanded payment of $600,000 of the $1 million within 15 days, as authorized by the Namco note.

3

Afra never received the money. On October 14, 2008 Zaghi called Hakakian and informed him he and Afra were holding the Artech note and had a lien on the Artesia building. Hakakian was surprised, having assumed Namvar had decided not to fund the Artech loan. Hakakian told Zaghi he had not borrowed money from Namvar and had no obligation to Namco.

After receiving the telephone call from Zaghi, Hakakian called Namvar and asked whether he had used the Artech loan documents as security for a loan from Zaghi. Namvar admitted he had done so but told Hakakian he would pay it back and Hakakian would not be harmed. Later that day Hakakian sent Namvar an email demanding Namvar return the Artech loan documents and remove any liens from the Artesia building. On October 29, 2008, after two weeks of reassurances but no action, Hakakian went to Namco's offices to demand the return of his documents. When Namvar would not speak with him, Hakakian became outraged and started slamming drawers and kicking file cabinets. Namvar appeared and signed a letter confirming the loan had never been funded and Artech owed no money to Namco.

2. *The Lawsuit*

Afra filed his complaint in this action on October 22, 2008 naming as defendants Namco, Namvar, Artech, Hakakian and Park General, Inc..[2] The complaint contained six causes of action.[3] Artech and Hakakian answered the complaint, denying liability and

---

[2]    Park General, Inc. was originally named as a defendant in this action but was dismissed in 2009. Neither Park General, Inc. nor Zaghi is involved in this appeal.

[3]    The first cause of action, against Namco only, sought to enforce the Namco note and judicial foreclosure of Afra's security interest in the recorded collateral assignment of the Artech note. The second and third causes of action, against Artech, sought judicial foreclosure of the Artech deed of trust and enforcement of the Artech assignment of leases. The fourth cause of action, against Hakakian, alleged Hakakian had breached his personal guaranty of the Artech note. The fifth cause of action, against Namvar, alleged breach of Namvar's guaranty of the Namco note. The sixth cause of action alleged fraud against Namco, Namvar, Artech and Hakakian.

In December 2008 Namvar and Namco answered the complaint, but the action was stayed as to them as a result of their bankruptcies. Park General, Inc. was dismissed in

4

alleging the Artech note and deed of trust were void because the loan had never been funded.

On May 29, 2013, after a three-day bench trial, the court issued a minute order entitled "Ruling on Submitted Matter." Addressing the remaining claims the court concluded Afra was not a "bona fide purchaser" of the Artech note and the agreement contemplated in the note was void for lack of consideration because it had never been funded. As to the question whether Hakakian and Artech were estopped from denying the validity of the note, the court concluded Afra had not met the requirements of the estoppel test in *Banco Mercantil, S.A. v. Sauls, Inc.* (1956) 140 Cal.App.2d 316 (*Banco*), because there had been no misrepresentation: "The evidence is clear that there were no representations made by [Hakakian and Artech] to [Afra]. If [Afra] argues that the misrepresentations are found within the language of the Artech Note then a closer look at the Note shows that it is conditioned upon funding. [Afra] could have made an inquiry about the Note before he relied upon representations made by . . . Namco." The court also found that there had been no intentional misrepresentations or concealment by Hakakian: "[N]egligence is not the inquiry; misrepresentations and/or concealment are needed to invoke estoppel. There is no showing here of intentional acts."

3. *Attorney Fees and Costs*

Hakakian and Artech moved for an award of attorney fees in the amount of $193,565.40, the fees charged by their attorneys for the defense of the action. They contended the attorney fees were available under Civil Code section 1717[4] because the Artech note, even though found to be void, contained a provision authorizing the prevailing party to recover attorney fees and costs of suit. The trial court granted the motion and awarded Artech the sum of $120,000, consisting of 320 hours of attorney time multiplied by an hourly rate of $375.

---

April 2009. In October 2010 Afra dismissed defendants Namco and Namvar, leaving only Artech and Hakakian as defendants.

[4] Statutory references are to the Civil Code unless otherwise indicated.

**CONTENTIONS**

Afra contends the trial court erred as a matter of law in concluding the Artech note was invalid and in failing to find that Hakakian was complicit in Namvar's fraud. Afra also contends the court erred by construing section 3543 to require evidence of fraudulent intent; according to Afra, Hakakian's negligence alone was sufficient to estop him from denying the validity of the Artech note. Finally, Afra contends the court erred in awarding attorney fees under section 1717 and that the fees awarded were excessive.

**DISCUSSION**

1. *Standard of Review*

An appealed judgment or order is presumed to be correct. "'All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown . . . .'" (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564; see also *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133.) A litigant appealing from a bench trial bears the burden of creating an adequate record for appeal by "secur[ing] a statement of decision under Code of Civil Procedure section 632 *and,* pursuant to Code of Civil Procedure section 634, bring[ing] any ambiguities and omissions in the statement of decision to the trial court's attention." (*Fladeboe v. American Isuzu Motors, Inc.* (2007) 150 Cal.App.4th 42, 58 (*Fladeboe*).) "The clear implication of this provision, of course, is that if a party does not bring such deficiencies to the trial court's attention, that party waives the right to claim on appeal that the statement was deficient in these regards, and hence the appellate court will imply findings to support the judgment." (*In re Marriage of Arceneaux,* at pp. 1133-1134; accord, *Fladeboe,* at p. 58.)

Afra, who did not secure a separate statement of decision and did not object to the court's findings, contends the May 29, 2013 minute order containing the court's ruling was not a tentative decision and was sufficient because the court's views are clear from the trial transcript. That reasoning is insufficient to avoid the doctrine of implied findings: Under the authorities cited above, we may infer the trial court made all findings necessary to support the conclusion Hakakian did not intend to defraud Afra by executing the Artech

6

note. We review that finding under the substantial evidence standard.[5] (See *Fladeboe, supra,* 150 Cal.App.4th at p. 60.)

We, of course, review questions of law, including statutory interpretation and contract interpretation (in the absence of a conflict in the evidence), de novo. (*In re Tobacco II Cases* (2009) 46 Cal.4th 298, 311; *Blaich v. West Hollywood Rent Stabilization Dept.* (2011) 195 Cal.App.4th 1171, 1175; *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1134.)

   2. *Substantial Evidence Supports the Court's Finding Hakakian Was Not Complicit in Namvar's Fraud*

Afra contends the "undisputed facts" demonstrate Hakakian's willing and intentional participation in Namvar's use of the Artech loan documents to solicit an infusion of cash into Namco. Many of the "facts" identified by Afra are derived from emails sent by Hakakian to a variety of individuals, including Namvar and other Namco employees, about outstanding loans or future loans. While these emails show Hakakian's clear intention to help Namvar surmount his cash flow problems, there is no direct evidence establishing Hakakian's intent to solicit additional capital for the benefit of Namco through the false pledging of the Artesia building as collateral. Hakakian testified he had no such intent, was surprised when he heard his request for a loan had been approved, and, when it was not funded, simply assumed Namvar had decided not to

---

[5]     Under the substantial evidence test, "'[W]e are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party [citations] and in support of the judgment . . . . "In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*" [Citation.] All conflicts, therefore, must be resolved in favor of the respondent.'" (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 60; accord, *Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.) "When we consider whether the evidence was sufficient to support the . . . verdict, we review the entire record in the light most favorable to the judgment to determine whether there are sufficient facts, contradicted or uncontradicted, to support the judgment. [Citation.] Substantial evidence is evidence that is reasonable and credible. In evaluating the evidence, we accept reasonable inferences in support of the judgment and do not consider whether contrary inferences may be made from the evidence." (*Mammoth Lakes Land Acquisition, LLC v. Town of Mammoth Lakes* (2010) 191 Cal.App.4th 435, 462-463.)

7

proceed. Hakakian also testified he did not know there were liens on the Artesia building as a result of the recording of the Artech deed of trust and the collateral assignment to Afra and Zaghi. Once he learned of the assignment, he demanded that Namvar return his documents and secured from Namvar a letter stating the loan had never been funded.

This testimony is more than adequate to support the court's finding. The determination of Hakakian's intent was within the exclusive purview of the trial court; and it was "entitled to accept or reject all or any part of the testimony of any witness." (*Kelly-Zurian v. Wohl Shoe Co.* (1994) 22 Cal.App.4th 397, 409; see *People v. Elliott* (2012) 53 Cal.4th 535, 585 ["'it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends'"]; *Linear Technology Corp. v. Tokyo Electron Ltd.* (2011) 200 Cal.App.4th 1527, 1534 ["we may not reweigh the evidence or judge the credibility of witnesses unless their testimony is 'inherently improbable or clearly false'"].)

3. *The Trial Court Did Not Err in Finding No Misrepresentation Occurred*

The court's finding Hakakian made no misrepresentations to Afra is also subject to the substantial evidence test and application of the implied findings doctrine with one exception: We review de novo the court's determination the Artech loan documents contained no misrepresentation. Nonetheless, we agree with the court's conclusion. The text of the Artech promissory note is clear: "Payments on this Note shall be due and payable commencing on the first calendar day of the first calendar month *following the funding of this Note*, and continuing on the first day of each successive calendar month . . . ." (Italics added.) As Hakakian points out, the existence of a condition precedent made the note nonnegotiable. (See Cal. U. Com. Code, §§ 3104, subds. (a) ["'negotiable instrument' means an unconditional promise or order to pay a fixed amount of money . . . ."] & (d) ["[a] promise . . . is not an instrument if, at the time it is issued or first comes into possession of a holder, it contains a conspicuous statement, however expressed, to the effect that the promise . . . is not negotiable . . ."]; 3106, subd. (a) ["for the purposes of subdivision (a) of section 3104, a promise . . . is unconditional unless it

8

states (1) an express condition to payment . . .”]; see generally, 4 Witkin, Summary of Cal. Law (10th ed. 2005) Negotiable Instruments, §§ 10-12, pp. 367-371.)[6]

That neither Afra nor Zaghi recognized the import of this condition is irrelevant. The instructive case on this principle, upon which both parties rely, is *Banco, supra,* 140 Cal.App.2d 316, in which a Mexican bank sought to collect on checks issued to its customer, a grower, by the grower’s marketing agent in the United States. Because the grower had collected advances on produce it never delivered, the agent altered the form of the checks to destroy their facial negotiability under both Mexican and California law to the extent necessary to offset the amounts paid for the undelivered produce. Based on its history with the grower, the bank ignored the defects in the nonnegotiable checks and cashed them for the grower. The bank then sued the agent when the checks were rejected by the agent’s bank in California, arguing the agent was estopped from asserting against the bank the offset due from the grower. (*Id.* at pp. 320-321.) The Court of Appeal reversed the trial court judgment in favor of the Mexican bank because the evidence did not support the conclusion the marketing agent was estopped. (*Id.* at pp. 323-324.)

With respect to the estoppel argument, the court stated: “Four things are essential to the application of the doctrine of equitable estoppel. They are: [¶] 1. There must have been a misrepresentation or concealment of the matters of fact as to which the estoppel is claimed; [¶] 2. The party to be estopped must intend that the other party act upon the assumption of the truth of that fact; [¶] 3. The party claiming the estoppel must be

---

[6] As explained in more detail, “An instrument does not freely circulate in commerce if a purchaser must examine a separate agreement to determine whether payment of the instrument is conditioned upon the performance of some act or event. [Fn. omitted.] The purchaser would, in this event, be required to track down the other agreement before deciding whether to purchase the instrument. For this reason, an instrument is not negotiable which requires that reference be made to a separate agreement in order to determine the holder’s right to payment. [Fn. omitted.] [¶] . . . The mere existence of the requirement that another writing be consulted is sufficient to destroy negotiability; it is irrelevant that examination of the other writing does not reveal a condition precedent to payment.” (6 Hawkland et al., Uniform Commercial Code Series (1999) Negotiable Instruments [rev.] § 3-106:2, pp. 3-75 to 3-76.)

9

ignorant of the true facts; [¶] 4. He must rely to his injury upon the conduct of the party to be estopped." (*Banco, supra,* 140 Cal.App.2d at p. 323.) As to the first prong of misrepresentation, the court added, "The first essential may be established either by proof of actual misrepresentation or by proof of careless and culpable conduct resulting in the deception of the party entitled to claim the estoppel." (*Ibid.*)

As this last statement demonstrates, Afra is correct the court erred in concluding under *Banco* that estoppel requires intentional misrepresentation by the party to be estopped. However, we reject Afra's further contention he was entitled to prevail on his estoppel claim against Hakakian through application of section 3543, which provides, "Where one of two innocent persons must suffer by the act of a third, he, by whose negligence it happened, must be the sufferer." Afra's argument that Hakakian's negligence in allowing Namvar to retain the executed Artech loan documents without funding the loan requires that he suffer the loss rather than Afra is misplaced.

As described in *Wurzl v. Holloway* (1996) 46 Cal.App.4th 1740, "The concept of . . . section 3543 is basically an estoppel theory, addressing comparative fault between two innocent victims. It is based upon misplaced confidence by one victim resulting in victimization of the other: 'Misplaced confidence has been held to be negligence within section 3543 and has resulted in the estoppel of a true owner from asserting title against an innocent party. [Citations.]' [Citation.] '[S]ection 3543 . . . "has been applied to bona fide purchasers for value from those who have been clothed with the indicia of ownership. It has been held that although the true owner is guilty of no more than misplaced confidence, such misplaced confidence is negligence with the meaning of section 3543."'" (*Wurzl,* at p. 1752.) The *Wurzl* court relied on this doctrine to affirm a trial court ruling that a couple selling their home should suffer the loss when the defrauding purchaser (whom the couple had allowed to select the escrow company) sold the home in a separate transaction to a bank. According to the appellate court, the couple selling their home had doubts about the escrow arrangement and could have taken steps to cancel the escrow; the bank, on the other hand, had no knowledge of this transaction and could not have foreseen the fraud. (*Id.* at p. 1754; see also *Reusche v. Cal. Pacific Title Ins. Co.* (1965)

10

231 Cal.App.2d 731, 738-739 [applying section 3543 against a woman who misplaced confidence in her agent and failed to inquire about the legitimacy of a forged promissory note].)

As explained in *Banco, supra*, 140 Cal.App.3d 316, section 3543 does not save Afra's claim. As discussed, the *Banco* court reversed the judgment in favor of the bank, which had received the purported checks in the ordinary course of its business. The bank had accepted checks that on their face were nonnegotiable. Describing the third prong of the estoppel test, which requires the party claiming the estoppel to be ignorant of the true facts, the court stated, "[I]t is necessary that the evidence show not only that the party claiming the estoppel did not have actual knowledge of the true facts but that he did not have notice of facts sufficient to put a reasonably prudent man upon inquiry, the pursuit of which would have led to actual knowledge . . . ." (*Banco,* at p. 323.) Relating this principle to the bank's acceptance of the nonnegotiable checks, the court explained: "By issuing a negotiable instrument, the maker holds out to the world that he will not assert against a holder in due course any defenses he may have against the payee. When, however, he issues a nonnegotiable instrument this representation is lacking, and he may assert any defenses that he has against a payee, even though the instrument which he issues purports to waive that right. [Citation.] The fact that [the bank's] manager accepted the instrument for deposit and gave [the grower] credit for the amount under the mistaken belief that it was negotiable does not change the situation even if such mistake be considered one of fact. His mistake could not change the instrument from a nonnegotiable one to a negotiable one, nor change the character of the defendant's obligation under the instrument . . . ." (*Id.* at pp. 323-324.) The court concluded section 3543 had no application since both parties were equally negligent in relying upon the good faith of the grower, and the bank "had the last opportunity to, by exercising care, avoid the loss." (*Id.* at p. 324.)

The trial court thus correctly rejected Afra's estoppel argument because of the express, stated condition on payment that rendered the note nonnegotiable. Hakakian and

11

Artech were properly allowed to pursue the dispositive defense that the loan was never funded.

>    4. *The Attorney Fee Award Was Authorized and the Amount Was Within the Trial Court's Discretion*

>    a. *Governing Law*

Section 1717, subdivision (a), authorizes the trial court to award reasonable attorney fees to the prevailing party in a contract action if the contract specifically provides for an award of such fees.[7]  "[T]he party prevailing on the contract shall be the party who recovered a greater relief in the action on the contract."  (§ 1717, subd. (b)(1).)  "[W]hen a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under section 1717 as a matter of law."  (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876; accord, *Zintel Holdings, LLC v. McLean* (2012) 209 Cal.App.4th 431, 440.)  "[W]hen the decision on the litigated contract claims is purely good news for one party and bad news for the other . . . a trial court has no discretion to deny attorney fees to the successful litigant."  (*Hsu,* at p. 876; see *Zintel Holdings,* at p. 443.)  The "validity or existence of the contract alleged in [the] complaint is not a prerequisite to an award of attorney fees under section 1717. . . .  [A] party is entitled to attorney fees under section 1717 'even when the party prevails on grounds the contract is inapplicable, invalid, unenforceable or nonexistent, if the other party would have been entitled to attorney's fee had it prevailed.'"  (*Hsu,* at p. 870.)

The abuse of discretion standard governs our review of the trial court's determination of a reasonable attorney fee.  (E.g., *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140; *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1096 (*PLCM Group*).)  "[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the

---

[7]    Section 1717, subdivision (a), provides:  "In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.  [¶] . . . [¶]  Reasonable attorney's fees shall be fixed by the court, and shall be an element of the costs of suit."

number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group,* at p. 1095.) "Under this method, the court 'begins with a touchstone or lodestar figure, based on the "careful compilation of the time spent and reasonable hourly compensation of each attorney . . . involved in the presentation of the case."' [Citation.] The lodestar 'should ordinarily include compensation for *all* the hours *reasonably spent*' on the case [citation], but the court must 'carefully review attorney documentation of hours expended; "padding" in the form of inefficient or duplicative efforts is not subject to compensation.' [Citation.] The lodestar may then be adjusted 'to fix a fee at the fair market value for the particular action.'" (*Komarova v. National Credit Acceptance, Inc.* (2009) 175 Cal.App.4th 324, 348.)

"The value of legal services performed in a case is a matter in which the trial court has its own expertise. [Citation.] The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony. [Citations.] The trial court makes its determination after consideration of a number of factors, including the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.'" (*PLCM Group, supra,* 22 Cal.4th at p. 1096.) "'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while his [or her] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong"—meaning that it abused its discretion.'" (*Id.* at p. 1095.)

    b. *The award was authorized*

Afra contends fees should not have been granted under section 1717 because the case was decided on theories of fraud, misrepresentation and estoppel, not in an action on a contract. This argument lacks any merit.

California courts liberally construe the term "on a contract" for purposes of attorney fee claims under section 1717. """As long as the action 'involve[s]' a contract it is '"on [the] contract"' within the meaning of section 1717."""" (*Turner v. Schultz* (2009) 175 Cal.App.4th 974, 979-980.) "In determining whether an action is 'on the contract'

13

under section 1717, the proper focus is not on the nature of the remedy, but on the basis of the cause of action." (*Kachlon v. Markowitz* (2008) 168 Cal.App.4th 316, 347; accord, *In re Tobacco Cases I* (2011) 193 Cal.App.4th 1591, 1602.) "If an action is 'on a contract,' section 1717 applies even when only equitable relief is sought." (*Tobacco Cases I*, at p. 1602; see *Kachlon*, at pp. 346-347 [rejecting argument equitable claims arising from promissory note and deed of trust were not "on the contract" within the meaning of § 1717].)

Afra sued Hakakian and Artech, among others, to recover the $1 million he loaned to Namco. His original causes of action against Hakakian and Artech included fraud but also sought judicial foreclosure on the security interest he believed had been created under the Artech loan documents and assigned to him by Namco. Afra's entire purpose in suing Hakakian and Artech was to enforce the Artech note or, in the alternative, Hakakian's guaranty. Even his claim of estoppel— prompted by Hakakian and Artech's assertion the Artech loan documents were void—was premised on the enforceability of those same documents, each of which contained an attorney fees provision.[8] Indeed, Afra himself sought an award of attorney fees from Hakakian and Artech in the complaint. The trial court did not err in finding the action was based on a contract for purposes of an attorney fees award under section 1717.

c. *The fees awarded were reasonable and supported by adequate evidence*

Afra has failed to show the court abused its discretion in awarding $120,000 in fees, or roughly 62 percent of the fees actually billed to Artech by its counsel. The final

---

[8]     The Namco note contained a unilateral attorney fees provision placing the burden on Namco; such a provision, however, would have been read to place a reciprocal burden on Afra had he sued Namco to enforce the note and lost. (See *Trope v. Katz* (1995) 11 Cal.4th 274, 285 ['[t]he statute was designed to establish mutuality of remedy when a contractual provision makes recovery of attorney fees available to only one party, and to prevent the oppressive use of one-sided attorney fee provisions"]; *Kachlon v. Markowitz, supra,* 168 Cal.App.4th at p. 346 ["[w]here a contract provides that only one party may obtain attorney's fees in litigation, [§ 1717] makes the right to such fees reciprocal, such that the 'party prevailing on the contract' claim will be entitled to recovery of the fees, 'whether he or she is the party specified in the contract or not'"].)

figure demonstrates the court exercised its discretion to reduce the hours billed based on what it perceived as duplicative or unnecessary work or work attributable to issues not entwined with the contract issues.  (See *Zintel Holdings, LLC v. McLean, supra,* 209 Cal.App.4th 431, 443 ["[a] court may apportion fees even where the issues are connected, related or intertwined"]; *Amtower v. Photon Dynamics, Inc.* (2008) 158 Cal.App.4th 1582, 1604 ["[w]here fees are authorized for some causes of action in a complaint but not for others, allocation is a matter within the trial court's discretion"]; see *Tuchscher Development Enterprises, Inc. v. San Diego Unified Port Dist.* (2003) 106 Cal.App.4th 1219, 1248 [rejecting claim case was overstaffed with attorneys from two law firms; claim that fees were unreasonable or duplicative, unaccompanied by any explanation or citation to the record, is insufficient to disturb the trial court's discretionary award of attorney fees]; *Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134 ["[t]he only proper basis of reversal of the amount of an attorney fees award is if the amount awarded is so large or small that is shocks the conscience and suggests that passion and prejudice influenced the determination"].)

## DISPOSITION

The judgment is affirmed.  Hakakian and Artech are to recover their costs on appeal.


PERLUSS, P. J.


We concur:



WOODS, J.



ZELON, J.

15